HOLTON v. REED et al.

No. 4309.

United States Court of Appeals
Tenth Circuit.

Dec. 13, 1951.

Eugene C. Paine, Albuquerque, N. M., and G. T. Hanners, Lovington, N. M. (George L. Reese, Jr., Carlsbad, N. M., Eugene C. Paine, Albuquerque, N. M., and G. T. Hanners, Lovington, N. M., were on the brief), for appellees.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

Louis Holton, individually and as executrix of the estate of Roscoe Holton, deceased, brought this action against Reed and Burns to recover possession of 325 shares of stock in the Lovington National Bank[1] of Lovington, New Mexico, located in Lea County, New Mexico. Burns was a stockholder in the Lovington Bank and vice-president and director thereof. Roscoe Holton held substantial interests in Lea County. Burns filed a counterclaim by which he sought specific performance of an oral contract entered into between him and Roscoe Holton, by which they agreed that they would undertake to purchase sufficient stock in the Lovington Bank to enable them, together with the other directors of the bank through such other directors' stock ownership, to control and determine the policies of the bank, and by which Burns and Roscoe Holton each agreed that he would not thereafter sell or dispose of the Lovington Bank stock held by him without first offering it for sale to the other, and by which they agreed that upon the death of either, the survivor should have the right to acquire the Lovington Bank stock of the decedent upon payment to the executor or personal representative of the decedent the sum of $100 per share, or the book value of such stock, whichever should be greater.

The findings of the trial court are supported by substantial evidence, are not clearly erroneous, and are binding on this court.[2]

The facts reflected by such findings are these: In September, 1949, Burns and Roscoe Holton entered into the verbal contract referred to above. At that time Burns was

E. L. Klett, Lubbock, Tex. (Neal & Girand, Hobbs, N. M., and Klett, Bean, Evans & Justice, Lubbock, Tex., were on the brief), for appellant.

1. Hereinafter called the Lovington Bank.

2. McNutt Oil & Refining Co. v. Mimbres Valley Bank, 10 Cir., 174 F.2d 311, 313.

the owner of 80 shares of stock in the Lovington Bank. Pursuant to such agreement Burns acquired 100 shares of stock in the Lovington Bank, 90 shares of which were paid for by Roscoe Holton and issued to him and 10 shares of which were paid for by Burns and issued to him. As a part of such oral contract Burns and Roscoe Holton agreed with each other and with the Second National Bank of Houston, Texas,[3] with which the Lovington Bank did business, that they would pledge to such bank 70 shares of the stock of Burns and 90 shares of the stock of Roscoe Holton,[4] and such additional stock as they should thereafter acquire, to secure funds to be advanced by the Houston Bank with which to purchase such additional stock; and that such additional shares of stock would be issued to Burns and Roscoe Holton in equal amounts.

Pursuant to such agreement, Burns acquired in the aggregate 570 shares of stock in the Lovington Bank, including the 100 shares first purchased. The remaining 470 shares were issued, 235 shares to Burns and 235 shares to Roscoe Holton.

Burns and Roscoe Holton executed three joint and several promissory notes to the Houston Bank, one dated December 9, 1949, for $14,500, due 90 days after date; one dated December 14, 1949, for $17,500, due 90 days after date, and one dated December 15, 1949, for $14,000, due 90 days after date, each bearing interest at 3% per annum after maturity. Roscoe Holton pledged 325 shares of his stock in the Lovington Bank to secure such notes and Burns pledged 305 shares of his stock in the Lovington Bank to secure such notes.

On December 27, 1949, Burns executed an assignment of his Lovington Bank stock to Roscoe Holton and Roscoe Holton executed an assignment of his Lovington Bank stock to Burns. Each assignment appointed the cashier of the Lovington Bank as the agent of the assignor to transfer to the assignee the Lovington Bank stock held in the assignor's name. Such assignments were placed in an envelope, on the outside of

which was written "Escrow," and Burns and Roscoe Holton agreed that in the event of the death of either, the assignment executed by him would be used by the survivor to cause the transfer of the Lovington Bank stock held by the decedent at the time of his death to the survivor, upon the payment of the agreed price, that is, $100 per share, or the book value, whichever was greater.

Roscoe Holton died on March 5, 1950. A few days later Burns tendered to Louise Holton the $32,500 for the 325 shares of Lovington Bank stock standing in the name of Roscoe Holton, less one-half of the indebtedness to the Houston Bank, which Burns agreed to pay in full. Louise Holton refused such tender. Burns then procured the envelope containing the assignments and gave to Louise Holton the assignment which had been executed by him and retained the assignment which had been executed by Roscoe Holton. On March 5, 1950, the book value of the Lovington Bank stock was less than $100 per share.

After the death of Roscoe Holton and before the maturity of such notes, the Houston Bank assigned such notes and the bank stock held by it as collateral security to Reed.

The capital stock of the Lovington Bank consists of 2,000 shares, owned in small amounts by many stockholders and at the time of the death of Roscoe Holton and the trial below, there was no open market for such stock.

Burns has, at all times, been ready, able and willing to pay Louise Holton $100 per share for the 325 shares of Lovington Bank stock held by Roscoe Holton at the time of his death and pay off and discharge the indebtedness to the Houston Bank evidenced by such notes.

At the trial below Burns renewed the tender referred to above.

As a defense to the action and as grounds for his counterclaim, Burns pleaded the verbal contract and the partial performance thereof.

3. Hereinafter called the Houston Bank.

4. It was necessary for Burns to retain, unincumbered, 20 shares of such stock to qualify him as a director of the Lovington Bank.

Reed filed an answer in which he averred that he held the notes and 630 shares of stock as collateral thereto and stated that he was willing to make such delivery of the stock as the court might direct upon payment to him of the principal of such notes, with interest to April 14, 1950.

The court entered a judgment by which it adjudged that Burns was entitled to receive the 325 shares of Lovington Bank stock standing in the name of Roscoe Holton at the time of his death, upon the payment to the clerk of the court of $9,342.87, for transmittal by such clerk to Louise Holton, and upon the cancellation and deposit with the clerk of the court of the three promissory notes assigned to Reed and that upon such payment and deposit, the cashier of the Lovington Bank should be authorized to transfer such stock on the books of such bank to Burns. It further adjudged that Reed should surrender to Burns such notes and the 625 shares of Lovington Bank stock held by him as collateral security upon the payment to him by Burns of the principal amount of such notes with interest from their respective dates to March 5, 1950, at the rate of 3% per annum.

Louise Holton has appealed.

█ We are of the opinion that under the facts as found by the trial court, the agreement of Burns and Roscoe Holton to acquire stock in the Lovington Bank, to pledge such stock to the Houston Bank as collateral security for advances with which to purchase stock in the Lovington Bank, and the agreement that neither of them should thereafter sell the stock without first offering it for purchase by the other, and that upon the death of either the survivor should have the right to purchase the stock of the decedent upon payment of $100 per share, or the book value, whichever should be greater, was one indivisible verbal contract. We reach this conclusion because it seems clear that the purpose of the verbal contract was to acquire sufficient stock in the Lovington Bank to enable Burns and Holton, with the other directors, to control the Lovington Bank and its policies, and that the purchase by one of the stock held by the other, in the event the latter should desire to sell his stock, and the acquisition, in the event of the death of one of them, of the decedent's stock by the survivor, was essential to the continued effectuation of the purpose of the agreement.

A substantial part of such indivisible contract was performed by Burns and Roscoe Holton.

█ New Mexico has not enacted a statute of frauds, but the English statute of frauds [5] is in force in New Mexico as a part of the common law under 19 N.M.St.1941, § 303; [6] Childers v. Talbott, 4 N.M. (Gild.) 336, 16 P. 275. See also Pitek v. McGuire, 51 N.M. 364, 184 P.2d 647, 1 A.L.R.2d 830.

█ It is a well established principle of equity, applying in every transaction where the statute of frauds is invoked, that such statute having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting or aiding the party who relies upon it in the perpetration of a fraud. [7] The doctrine is not limited to any particular class of contracts included within the statute of frauds, provided the essential elements of estoppel are present. [8] There need be no precedent corrupt motive or evil design. It is sufficient if a fraud inheres in the consequence of the

5. "No contract for the sale of any goods, wares, or merchandise for the price of £10 sterling, or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part of payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

6. Section 303, supra, provides: "In all the courts in this state the common law as recognized in the United States of America, shall be the rule of practice and decision."

7. Pomeroy's Equity Jurisprudence, 4th Ed., Vol. 2, § 921.

8. Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88, 94; Diamond v. Jacquith, 14 Ariz. 119, 125 P. 712, 715, L.R.A.1916D, 880.

394

defendant's setting up the statute of frauds.[9]

■ The term "fraud" does not mean actual fraud or conscious deceit. It means unjust or unconscionable conduct, such that the refusal to complete the execution of the contract would not be merely a denial of rights which it was intended to confer, but would inflict unjust and unconscientious injury and loss for which courts of law are unable to afford an adequate remedy.[10]

■ Where one party to an oral contract has, in reliance thereon, so far performed his part of the agreement that he would suffer an unjust or unconscionable injury and loss if the other party should be permitted to set up the statute as a defense, equity will regard the case as removed from the operation of the statute and will enforce the contract by decreeing specific performance of it or by granting other appropriate relief.[11]

■ Burns purchased stock in the Lovington Bank and caused the shares purchased to be distributed between him and Roscoe Holton so that each would own an equal number of shares. He signed joint notes with Roscoe Holton to secure funds with which to purchase 470 shares of such stock. The purpose of the agreement was to control, with the other directors, the Lovington Bank and its policies. In order to continue that control after the death of Roscoe Holton, it was necessary for Burns to acquire Holton's shares of stock, since there was no open market for the stock of the Lovington Bank and such stock could not be readily procured. Hence, the Roscoe Holton stock was of peculiar value to Burns.

We are of the opinion that to permit Louise Holton to assert the statute of frauds as a defense would prevent the continued effectuation of the purpose and object of the indivisible oral contract, the major portion of which had been carried out by both Burns and Roscoe Holton, and would inflict an unjust and unconscionable injury and loss on Burns. We conclude that Louise Holton was estopped to assert the statute of frauds as a defense.

Since stock in the Lovington Bank was not obtainable in the open market and was not readily procurable by Burns, and since the acquisition of the stock issued to Roscoe Holton was of peculiar value to Burns in that it would enable him, with the other directors, to continue the control of the bank and its policies, Burns had no adequate remedy at law and was entitled to specific performance of the contract.[12]

Affirmed.

9. Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88, 94; Wolfe v. Wallingford Bank & T. Co., 124 Conn. 507, 1 A.2d 146, 151, 117 A.L.R. 932.

10. Hogan v. Thrasher, 72 Mont. 318, 233 P. 607, 609; Gallagher v. Gallagher, 31 W.Va. 9, 5 S.E. 297.

11. Glass v. Hulbert, 102 Mass. 24, 35; Seymour v. Oelrichs, 156 Cal. 782, 106

P. 88, 94; Diamond v. Jacquith, 14 Ariz. 119, 125 P. 712, 715, L.R.A.1916D, 880; Brown v. Byers, 118 Kan. 503, 235 P. 866, 867.

12. Nason v. Barrett, 140 Minn. 366, 168 N.W. 581, 582, and cases cited in notes 22 A.L.R. p. 1038 et seq. and 130 A.L.R. p. 923 et seq.