**ELLIS CANNING COMPANY, a Colorado corporation, Plaintiff,**

v.

**Arthur J. BERNSTEIN et al., Defendants.**

**Civ. A. No. C–3125.**

United States District Court,
D. Colorado.

Sept. 29, 1972.

William Robinson Fishman, Isaacson, Rosenbaum & Goldberg, by Sheldon E. Friedman, Denver, Colo., for plaintiff.

Sterling & Simon, by Harry M. Sterling, Denver, Colo., and Samuel M. Gilman, Rock Island, Ill., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge:

United Packers, Inc., is a food packaging company which, in 1970, had its main plant in Opelousas, Louisiana, and which maintained its managerial offices in Chicago, Illinois. It was run by the defendant Bernstein, a lawyer turned meat packer. One of its principal products was vienna sausage, and Ellis Canning, which is owned by N. L. Koin, is a large buyer and marketer of vienna sausage. Defendants Tunick and Stone were stockholders in and directors of United who acquired their interests in 1969 for an investment by Tunick of $75,000 and an investment by Stone of $25,000, but at all times material to this case, United was operated and controlled by Bernstein.

United was losing money, and by 1970, it was teetering on the brink of bankruptcy. Early in that year, Ellis started to purchase large quantities of vienna sausage from United, but these purchases were accomplished under unconventional financing arrangements. When

Ellis decided to place an order, one-half of the purchase price would be advanced to United to finance production of the order. Then, when the vienna sausage was manufactured and shipped, Ellis would pay the second half of the purchase price upon receipt of shipping documents. By mid-1970, all of the defendants had become convinced that United was a poor investment, and with the knowledge and approval of Tunick and Stone, Bernstein was trying desperately to sell the company, and he made several unsuccessful efforts to sell it to various of the large meat packers. Finally, with a bankruptcy proceeding under active study, and again with the knowledge and approval of Tunick and Stone, Bernstein contacted Koin to see if he could be interested in bailing out the three defendants. He assured Koin that United's problems were solvable, and he wrote that if United could build a reasonable volume, United should net at least $100,000 per year. [The volume Ellis was in a position to furnish United would have gone a long way towards providing the sales Bernstein said were needed to make up the "reasonable volume."] He also assured Koin that the values of physical assets shown on United's books were far below actual values.

There were many conversations, both telephonic and face to face, between Bernstein and Koin during the period of approximately July 1, 1970, to early October of that year. On October 6, 1970, Bernstein and United's vice-president, James Pitrie, came to Denver to try to finalize the sale. By this time, a purchase arrangement keyed to a Chapter XI Bankruptcy proceeding had been generally agreed to. The concept of this plan was that United would apply to the Bankruptcy Court for a Chapter XI arrangement; Ellis would advance operating capital to the Chapter XI, but the identity of Ellis would not be disclosed to United's creditors; United would be operated under Chapter XI with funds advanced by Ellis and a compromise arrangement would be worked out with the creditors. Ellis would then pay the defendants for their stock in United, and it would be transferred to Ellis; and, of course, at this point Ellis would own the company debt free for a total investment of its advances to the Chapter XI and its payment to defendants for their stock. This neat arrangement would permit United to operate under court protection while settlements with United's creditors were being effected, and, in the meantime, the advances by Ellis to the Chapter XI operation occupied in preferential position.

At the October 6, 1970, meeting, Bernstein and Pitrie met with Koin and Louis Isaacson, Koin's attorney, at Isaacson's office in Denver. Most of the discussion at this meeting had to do with the intricacies and mechanics of the Chapter XI purchase arrangement and its financing. It was agreed at this meeting that Ellis would provide $200,000 to the Chapter XI, $130,000 of which would be used for operating capital, and $70,000 to take care of the creditors' arrangement. Of course, this was contingent upon working out a satisfactory agreement for the purchase of defendants' stock in United, the purchase to be made, according to an earlier letter from United's Opelousas attorney, "independent of the Chapter XI proceedings," but the Chapter XI financing and the stock acquisition were always tied together as part of an overall plan.

The next day, Bernstein and Koin met at Koin's office to thrash out the stock purchase agreement and other remaining details of the deal. Following this meeting, Bernstein telephoned Isaacson and advised him that agreement had been reached between Bernstein and Koin encompassing the procedures to be followed and the advances to be made to the Chapter XI as well as the purchase of defendants' stock in United. Defendants were to receive $100,000 for their stock, but this amount was to be paid out of profits. Isaacson advised Bernstein that since time would not permit them to get together, he wanted Bernstein to summarize the agreement with Koin and that he wanted to tape record the sum-

marization. Bernstein approved the tape recording of the remainder of the conversation, and, at time of trial, he acknowledged its accuracy. A transcript of that full conversation was received in evidence, and during the taped portion of that conversation, this is what was said:[1]

"Telephone Conversation taped by consent of Art Benstein and N. L. Koin pertaining to Ellis Foods—United Packers, October 7, 1970.

"Isaacson: Just go ahead and tell me what it is because this is on the tape right now.

"Bernstein: Allright. The deal takes whatever form of documentation you consider necessary for proper protection obviously. But essentially it is this: That we are filing the Petition tomorrow morning when James gets into Apaloosa, Chapter 11. Nate is going to put up the operating capital within the range we talked about and possibly, if it's necessary, the money for settlement with general creditors which we are not now talking about in terms probably of around one-third and he is making a deal with the stockholders —of course, any money he puts up will be put up as we discussed through the receiver so he has the protection and before it's put up that will be your dealings with the receiver to be sure it's okay; and the only thing coming to the stockholders for stock will be on the following basis: After there is a profit for the year the first $20,000 off of that profit goes to Ellis or whoever it is that acquires the stock for putting up the money—you may decide it's Nate personally or one of his corporations. The first $20,000 goes back—this represents, in effect, a return of 10% on somewhere between $130,000 and $200,000 but it's a fixed first $20,000 of profit goes to Ellis. Any profit above that

is split 50–50—half of it to Ellis and half of it to the stockholders against a purchase price for the stock of $100,000 which is only payable out of this 50% of profit, and in outline that's the whole situation.

"Isaacson: Okay. You have a list of stockholders, have you? Or will send to me?

"Bernstein: Yes I can very easily do that—he has it here but if you would want to drop me a line tomorrow and tell me anything that you want I can be glad to give you that, in addition to the names of the stockholders.

"Isaacson: I see.

"Bernstein: I would give you names and addresses of the stockholders. There are only three of us involved.

"Isaacson: Oh well why don't you just put them on this—tell me who they are right now, then?

"Bernstein: Fine. There's Al Tunick of Moline, Illinois.

"Isaacson: How many shares?

"Bernstein: Uh, 2,250 shares. There's Sam J. Stone of Peoria, Illinois, 750 shares; and there's Arthur J. Bernstein of Chicago, 5,000 shares; total of the three, 8,000 shares; and that's the only issued and outstanding stock.

"Isaacson: Okay, fine, and the name of the corporation is—

"Bernstein: I'll give you two things about that. It's United Packers, Inc., a Nevada corporation authorized to do business both in Louisiana and Illinois. That gives you the whole story and that stock is all common stock. There is no preferred. There are 2,000 of additional shares authorized but unissued.

"Isaacson: The total number issued are—

1. Art Samelson mentioned in the conversation was Koin's certified public accountant and was the Denver managing partner of Touche, Ross & Company.

"Bernstein: The total number issued is 8,000, and total number authorized is 10,000.

"Isaacson: I see, okay, that's all we need right now.

"Koin: I want to say one little thing that he made at his very beginning of where he's talking about a settlement with these people of a third which I am not in accord with the third. It would be less than a third to start negotiating after they go into Chapter 11 and I think you should know that now.

"Bernstein: I don't disagree with that, I think that at a later date we can develop a proposed arrangement and then discuss it with both you, Lou and Nate before anything is submitted to the court obviously.

"Isaacson: Allright, let me just add one thing, Nate. Did you discuss with Art the question of indemnity against any undisclosed liabilities?

"Koin: To the extent that I do need something legal set up.

"Isaacson: Well, there would an agreement (sic) by these shareholders, but I mean, this is the thing—

"Bernstein: My suggestion on that is that I would propose to send you a Xerox copy of the list of creditors which is being furnished to the Court and the Trustee.

"Isaacson: I think you should send that, but additionally, Art Samelson has mentioned in the past and I think, Nate, you should discuss with him the possibility of some kind of pre-acquisition audit or something like that. Now, to that extent that's a business judgment on your part, Nate, as to whether or not this you want to undertake.

"Bernstein: I certainly would have no objection to any such request, so you and Nate and Art work out whatever you want to on that.

"Isaacson: Nate, Art is at home. Why don't you call him at home and tell him that Art was running for the—I'm talking about Art Samelson—is at home so you might just call him at home and tell him I told you to call him and discuss this last matter with him.

"Koin: This matter is that you require—let me write it down.

"Isaacson: I don't require anything, but accounting practices might indicate that some investigation, some additional investigation be made of the financial status prior to signing contracts rather than to get indemnity as a part of the contract. This is something you can discuss with Art.

"Bernstein: In other words—discuss with Art the mechanics of how to make sure there are no undisclosed liabilities?

"Isaacson: Well, you won't make sure there aren't any, but he can do some things by audit that may give Nate a greater measure of reassurance.

"Bernstein: Can you help Nate keep the cost of such a thing down to a low figure?

"Isaacson: He's going to talk to samelson about that.

"Bernstein: Okay.

"Isaacson: Have a good trip back"

After the tape recorded telephone conversation, Bernstein and Pitrie drove to the airport, and, on the way, Bernstein told Pitrie that a deal had been made to sell the company to Koin, and that Pitrie should take his orders in the future from the Ellis people. Pitrie was informed as to many of the details of the agreement, but he was not told the purchase price of the stock.[2]

A week after his return to Chicago, Bernstein wrote Isaacson, saying in material part:

"In order to maintain the value of United Packers as a going operation

---

2. This lack of knowledge on Pitrie's part would seem to prevent application to his testimony of the statute of frauds exception set out in C.R.S. '63 155–8–319(d).

for Nate Koin, I am sure you agree it is essential that we complete our agreements and discussions of details on a plan to be proposed to creditors as quickly as possible. . . .

"Therefore, let's see if between us we can have all necessary documents completed well before the date when Nate plans to take his annual vacation, which I understand is about January . . . ."

On October 28, 1970, Bernstein wrote Samelson:

" . . . In view of the fact that we are energetically lining up sales, Lou will undoubtedly hear from James Pitrie or the receiver within a few days concerning some operating capital. . . ."

Bernstein had agreed to prepare a draft of a formal contract, but he didn't get around to doing so until February 19, 1971, although Isaacson several times requested that the draft be forwarded. In the meantime, the Chapter XI had been started and the parties went forward under their agreement. In fact, on December 7, 1970, with Koin's approval, Isaacson sent $110,000 to the Planters Trust & Savings Bank in Opelousas, Louisiana, to be paid by it to the receiver in exchange for receiver's certificates, and to repay the bank $50,000 it had advanced on receiver's certificates theretofore authorized. Isaacson's December 7, 1970, letter was in furtherance of a telephone conversation of that date between him and Wooten, the receiver, as is shown by Wooten's letter of the same date. Wooten said in his letter that the total amount of the required advances would be $130,000. At about this point in time Ellis employees started working with the United operation, and there was a dramatic turnaround in the profit and loss picture. This turnaround resulted from the availability of working capital provided by Ellis, the closing of the Chicago office, the Ellis Canning business, and managerial and accounting advice provided by Ellis people. On January

14, 1971, the receiver called on Isaacson for the balance of $20,000 still due from the agreed $130,000, but, by this time it had become apparent that the first estimate of $70,000 required to settle with the creditors was insufficient. That estimated $70,000 had already been increased to $80,000 by supplementary agreement with Koin, but some of the creditors were a bit obstinate, and the receiver said that it would take $90,000 to effect the settlement. Koin demurred to the $90,000 request, but agreement was reached with Bernstein that the amount to be paid to creditors would be increased to $90,000 in consideration of the amount to be paid out of future profits under the agreement with the stockholders being reduced from $100,-000 to $75,000. Tunick and Stone approved this reduction of the stock purchase price, and on January 21, 1971, Bernstein wrote Isaacson: [3]

"As requested, *this letter is written to confirm the agreed ultimate arrangement to be consumated between your client and the present shareholders of United Packers, Inc.*, including its relationship to the Chapter XI plan now being prepared for submission to creditors. . . .

"1. Your client has previously agreed to furnish a maximum of $80,000 to cover general unsecured creditors, so called 'contingent creditors' who will become general unsecured creditors after settlements have been made with them. . .

"2. In order to settle with certain contingent creditors, it presently appears we may have to exceed the $80,-000, perhaps by as much as $8,000 to $10,000.

"3. The stockholders will absorb this excess so that your client's $80,000 limit will be respected.

"4. Absorption by the stockholders will be in two stages. . . . In this connection, it is also understood that they (the stockholders) have accepted your client's requirement that the pur-

---

3. Copies of the Letter were sent to Koin, Tunick, Stone and Sandoz, the Louisiana attorney.

chase price for the stock, to be paid out of profits, must be reduced from the originally agreed $100,000 to $75,000." [Emphasis supplied.]

Just four days after Bernstein's letter, Wooten, the receiver, wrote Isaacson, saying "We are in desperate need of the additional $20,000 committed by your client as part of the advance on the Receiver's certificate of indebtedness," and the $20,000 was forwarded by Isaacson on February 2, 1971. Isaacson sent Bernstein a copy of his letter of transmittal of the $20,000 forwarded to Wooten, and inquired about the then still missing draft of the agreement to be prepared by Bernstein. As has been noted, Bernstein finally sent a draft of the written agreement on February 19, 1971. His letter of transmittal said:

"I hope and believe it (the draft of the agreement) is all we need, but have no pride of authorship which would prevent your making any suggestions or alterations you desire within the framework of our basic agreement."

The enclosed draft was of an agreement between Koin, as purchaser, and Tunick, Stone and Bernstein as sellers. It provided for the sale of all of the stock in United Packers for $75,000 and it contained these significant recitals:

"WHEREAS NATHAN L. KOIN is willing to furnish the operating capital necessary to continue said business provided he can also acquire for himself, or his designee, all of the outstanding capital stock of UP and,

"WHEREAS to avoid such a bankruptcy and discontinuance of the business, Second Parties, as members of the Board of Directors, previously authorized the firm of Sandoz, Sandoz & Schiff to file a Petition for a Plan of Arrangement under Chapter XI of the Bankruptcy Act for UP and such a petition was filed . . . and these Chapter XI proceedings are presently pending and a plan of arrangement has been filed with the Court and has been sent to the creditors for approval, and . . . .

"WHEREAS, in addition to the purchase price specified hereafter in this agreement, First Party has also agreed to furnish and has furnished operating capital to UP in the sum of $130,000, during the period of administration of the company under Chapter XI, and has also agreed to furnish not to exceed $80,000 for payment of a dividend to general creditors, for settlement with certain contingent creditors . . ., and,

"*WHEREAS, the parties have previously agreed verbally on many terms of a stock purchase agreement, with modifications, and now desire to reduce the entire agreement to writing* so that it may become fully effective upon confirmation by the United States District Court for the Western District of Louisiana of a Plan of Arrangement with the creditors of UP." [Emphasis supplied.]

The proposed agreement set forth the purchase price, provided that it should be paid from profits, with the first 20% of the profits to go to Koin and the remaining 80% to be divided between Koin and the stockholders, and it incorporated the agreements set forth in Bernstein's letter of January 21, 1971. Its concluding paragraph read:

"6. All parties to this agreement will sign whatever documents are deemed necessary to Louis G. Isaacson as Attorney for First Party and Arthur J. Bernstein as Attorney for Second Parties to make its terms fully effective."

Bernstein sent copies of his letter of transmittal and of the draft agreement to Tunick and Stone.

March 5, 1971, Isaacson mailed Bernstein a redraft of the agreement under a letter of transmittal which commented:

"I recognize that the same (the redraft) is quite different in form from that which you presented, and in some instances is different in substance. I assure you, however, that the same was drafted in careful adherence to the agreement which you dictated over the telephone prior to leaving for the Den-

ver Airport, as the same was amended by supplementary letters."

The transmittal letter urged speed in obtaining execution of the agreement and mentioned that Koin was planning to be absent from Denver for an extended period.

Within a week of the mailing of Isaacson's redraft to Bernstein, Sandoz wrote Isaacson:

"Subsequent to our call, we called Mr. Bernstein in Chicago and urged him to contact you to work out the agreement which he has with you relative to delivery of all of the stock.

"By copy of this letter we are urging him to complete this portion of this arrangement immediately so that you would be in a position to forward this deposit to us to permit finalization of this plan."

Immediately upon receipt of Sandoz' letter, Isaacson wrote Bernstein saying that Isaacson had been unable to reach him by telephone and saying:

"I trust you will realize that our funds are required in Louisiana on March 19 and that we have advised them that they will not be forthcoming unless sufficiently prior to that date we have in Denver signed contracts and stock certificates duly endorsed."

This letter from Isaacson was dated March 11, 1971, and it was on that day that Bernstein received a telephone message from one Cramer from Louisiana saying that Cramer wanted to make a cash bid for the Opelousas plant of United. Bernstein talked to Isaacson on the telephone the next day and for the first time voiced objections to and asked modification of Isaacson's redrafted agreement. Bernstein, of course, had knowledge of Cramer's message, but he did not mention anything about it to Isaacson. In this conversation with Bernstein, Isaacson said that he had no authority to modify the agreement reached between Koin and Bernstein and that if Bernstein wanted to change the deal, he would have to talk to Koin. Before attempting to reach Koin, Bern-

stein talked to Cramer on the telephone and he was assured by him that Cramer represented large financial interests. Bernstein did place a call to Koin's office late in the day on March 12, 1971, [a Friday] but the telephone was not answered, and Bernstein made no effort to reach Koin at home [although he had his home telephone number] and he made no effort to again contact Isaacson at either his office or his home. Instead, Bernstein called Cramer on March 13, and made arrangements to meet Cramer's principal in New Orleans on Sunday, March 14th. Bernstein and the principal, Hughes, met as agreed, and on his return to Chicago, Bernstein advised Tunick and Stone that he had assured Hughes that he "would send him a letter *outlining the provisions we had agreed on.*" Two days after the New Orleans meeting with Hughes, Bernstein wrote him:

"This letter will *confirm the agreement reached between us* for acquisition by you or your nominee of all of the outstanding stock of United Packers, Inc."

Needless to say, Hughes agreed to pay $100,000 for the stock instead of the $75,000 agreed to by Koin, and needless to say, Hughes was aware of the turnaround in the profit and loss picture resulting from Koin's operating capital, the Ellis business and the Ellis managerial methods which had been by then put into effect in United's operations. The very next day, Isaacson learned of the sale to Hughes, and he demanded back the $130,000 advanced to the Chapter XI operation. It, plus interest was repaid, and the deal with Hughes was consummated. Within 60 days this lawsuit was filed on behalf of Ellis Canning Company, a Colorado corporation with principal offices in Colorado, against Bernstein, Tunick and Stone, all Illinois citizens. The Court has diversity jurisdiction of the controversy which manifestly exceeds $10,000.00 in amount, exclusive of interest and costs.

Plaintiff, of course, says that defendants breached their contract with it for

the sale of the United Packers stock to plaintiff. Defendants defend on assorted grounds, among which are these contentions advanced by defendants:

1. There was no meeting of the minds nor was there any intent to be bound by the oral discussions.

2. There is a lack of mutuality in the alleged agreement.

3. Bernstein had neither actual nor apparent authority to bind Tunick and Stone, nor does any doctrine of estoppel apply to bind them.

4. Isaacson's demand for the return of the $130,000 operated to rescind any contract entered into among the parties.

5. The contract is unenforceable because of the statute of frauds.

The foregoing enumeration of contentions represents a condensation of the issues as phrased by the parties in their briefs, but we hope to cover all of the many arguments made by the parties in the course of this opinion.

■ We start with recognition of the fact that before there can be a contract, there must be a meeting of the minds. Taylor v. Roberts (1962) 10 Cir., 307 F. 2d 776. Whether there has been a meeting of the minds is a question of fact to be determined from all of the evidence in the case, Marti-Matter Co. v. Thomas (1921) 70 Colo. 478, 202 P. 703, but, as was said in Barrett v. Book Cliff Railroad Company (1921) 70 Colo. 440, 201 P. 1026:

". . . it is well settled that a contract may result from a series of letters determining the various matters, step by step. It is not important that all the terms of the agreement be set out in one instrument. If, from the correspondence, the intent of the parties to contract may be clearly inferred, it is sufficient."

In Colorado, there is no hard and fast definition of the "essential terms" which must be embodied in an agreement to determine whether there has been a meeting of the minds. American Mining

Company v. Himrod-Kimball Mines Company et al., (1951) 124 Colo. 186, 235 P.2d 804, where it was said:

"Our research discloses a lack of unanimity among decisions of courts of last resort as to what constitutes 'essential terms' in contracts generally, and particularly in instruments executed as preliminaries to contracts therein specified to be executed later. In such instances, we adhere to that which we believe to be the better and most generally accepted rule, that the 'essential terms' must, in each case, be determined from the intention of the parties as disclosed upon consideration of all surrounding facts and circumstances there prevailing."

In deciding whether the parties had agreed upon a lease, in D.A.C. Uranium Company v. Benton (1956) D.C.Colo., 149 F.Supp. 667, Judge Knous applied both the "intention" test of *American Mining Company,* supra, and the more concrete test of agreement as to boundaries, term, rental amount and time for payment adopted in Carlson v. Bain (1947) 116 Colo. 526, 182 P.2d 909. In R. H. Lindsay Co. v. Greager (1953) 10 Cir., 204 F.2d 129, defendant was a wool grower and plaintiff was a wool buyer. Plaintiff orally said that he would pay 80¢ for defendant's wool and defendant said that he would take it. Thereafter a short memorandum was prepared which did not set forth the full terms of the agreement. The Tenth Circuit held:

*"It is true that the parties intended that the terms of the agreement should be incorporated in the so-called 'Wool Purchase Contract' but this was not a condition to the validity of the offer and acceptance. The document was only a memorial of the completed oral agreement and did not affect its validity. . . .* [emphasis supplied]

"Generally speaking, a memorandum is sufficient if it sets forth with reasonable certainty the names of the parties to the contract, a description of the goods to which the contract relates and the essential terms and conditions constituting the oral contract, includ-

ing the consideration. (cit om.) All the essential provisions of the purchase and sale agreement are found in the memorandum."

Mid-Continent Petroleum Corp. v. Russell (1949) 10 Cir., 173 F.2d 620, is to the same effect.

As we approach resolution of the all important questions of whether the parties reached an agreement in this case and whether the objections raised by Bernstein to Isaacson's redraft of the agreement were such as to show that no agreement was reached, it is well to quote at length from the surprisingly similar case of V'Soske v. Barwick (1968) 2 Cir., 404 F.2d 495. There, Barwick was interested in purchasing a custom rug making business operated by V'Soske in Puerto Rico. The parties dickered as to the price to be paid for the business and as to audit procedures to be used. After exchanges of correspondence, Barwick wrote:

"I am willing, at this time, to increase my offer for a cash settlement for the audited book value of your company plus $700,000 to be paid in five equal annual installments of $140,-000 each, with management contracts or arrangements as we discussed on our two visits. . . ."

V'Soske accepted this offer with an explanation of the employment contracts and with a discussion of the audit procedures. Barwick replied saying that he agreed in principle with the suggested audit procedures and saying that he was sure that the accountants would have no trouble getting together. The parties started on the complicated closing procedures, and several questions were raised and settled between the parties. However, the parties were unable to resolve an argument concerning an outstanding exclusive sales contract of V'Soske's and they were unable to agree on accounting procedures. A draft of the proposed contract was circulated at this point and a meeting was thereafter held to settle the remaining problems and to revise the contract draft. Barwick changed his mind and advised

V'Soske that he was terminating the negotiations. In reversing a trial court decision that the facts represented "a classic case of preliminary negotiations which never ripened into a contract," the Second Circuit held that the parties had in fact entered into a contract when V'Soske accepted Barwick's offer quoted above. The court said:

"When viewed in light of the American Law Institute's Restatement definition of an offer as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it,' Restatement (Second) of Contracts § 24 (Tent. Draft No. 1, 1964), Barwick's letter can hardly be construed otherwise than as extending to V'Soske the power of acceptance. Regarded in this context, V'Soske's letter of November 29, since it made a substantial change in the terms of payment and added other significant terms, must be interpreted as a counter offer, which Barwick accepted by his letter of December 6 after receiving the clarifications he had requested.

"Appellees argue that even if the language of the correspondence may be so interpreted, there was no intent to be bound until the signing of a formal document, and hence no obligations were fixed. Two rules on this subject are well established: first, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. Smith v. Onyx Oil and Chemical Co., 218 F.2d 104, 50 A.L.R.2d 216 (3d Cir. 1955); Zirman v. Beck, 34 Misc.2d 597, 225 N.Y.S.2d 330 (1962); Karson v. Arnow, 32 Misc.2d 499, 224 N.Y.S.2d 891 (1962); Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431 (1894); Restatement

(Second) of Contracts § 26 (Tent. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957). Contract law has progressed and evolved sounder principles since the days of ritualistic and formalistic sealed instrument requirements. Thus, these rules placing the emphasis on intention rather than form, are sensible and reasonable.

"To overcome the reasonable inference we draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, appellees must do more than merely point to the circumstance that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that V'Soske had reason to know that Barwick contemplated that no obligations should arise until a formal contract was executed. But appellees have referred to no evidence substantiating either of these possibilities, and we do not find them supported by our independent review of the evidence. Moreover, the subsequent agreement of the parties that the V'Soske business would be run for the Barwick company's account starting January 1, 1964, and that all transactions after that date not occurring in the ordinary course of business would be subject to Barwick's approval strongly indicates that the parties thought they had a binding agreement at that time. Accordingly, we find that by their correspondence the parties did intend to create a contract for the sale of V'Soske Shops.

"Appellees strongly urge that even if we find contractual intent, nevertheless a binding contract never came into being because too many important terms were left unsettled by the exchange of letters. In support of this contention they point to the subsequent difficulties the parties encountered in reaching agreement on certain terms. The law is clear that although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result. Kusky v. Berger, 33 Misc.2d 564, 225 N.Y.S.2d 797 (1962), aff'd, 20 A.D.2d 851, 249 N.Y.S.2d 858 (1964); Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E. 2d 282 (1959); Warrin v. Charm Fashions, Inc., 193 Misc. 229, 82 N.Y.S.2d 476 (1948), aff'd 275 App. Div. 815, 89 N.Y.S.2d 704 (1940). But it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy. Park Inn Hotel Inc. v. Messing, 31 Misc.2d 961, 224 N.Y.S.2d 179 (1962); Biothermal Process Corp. v. Cohu & Co., Sup., 119 N.Y.S.2d 158 (1953), aff'd 308 N.Y. 689, 124 N.E.2d 323 (1954); Castelli v. Tolibia, Sup., 83 N.Y.S.2d 554 (1948), aff'd 276 App. Div. 1066, 96 N.Y.S.2d 488 (1950); May Metropolitan Corp. v. May Oil Burner Corp., 290 N.Y. 260, 49 N.E. 2d 13 (1943). In this case, almost all of the later points of contention, such as the provisions of the employment contract and the modification of the V'Soske agreement with Lord & Adams arose because the parties sought to amend their agreement to include new terms. Such negotiations on new provisions do not defeat the original agreement of the parties. See John W. Rouse Construction Corp. v. Albany Acoustical Corp., 9 A.D.2d 38, 189 N.Y.S.2d 532 (1959); Sanders v. Pottlitzer Bros. Fruit Co., supra. The only term in their original contract upon which the parties later faltered was 'audited net worth.' But that these parties failed to agree as to the valuation of audited net worth does not convince us that the term is intrinsically so difficult to ascertain as to defeat the contract. On the contrary, the term has a well defined meaning and provides a method of valuation by which the exact amount

contemplated can be determined. Castelli v. Tolibia, supra. And indeed, courts have upheld contracts where essential terms were far less definite. See, e. g., Biothermal Process Corp. v. Cohu & Co., supra; May Metropolitan Corp. v. May Oil Burner Corp., supra. Moreover, all the other terms essential to the agreement were specified in V'Soske's counter offer of November 29. We therefore hold that by their correspondence, the parties entered into a valid contract, which Barwick breached by his letter of March 9, 1964."

V'Soske is in full accord with the Restatement of Contracts, § 26:

"Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . .

"Comment:

" . . . b. The matter may be put in this way: If the parties indicate that the expected document is to be a mere 'memorial' of operative facts already existing, its non-existence does not prevent those facts from having their normal legal operation. What that operation is must be determined largely by oral testimony, or by preliminary or only partially complete writings. If the parties indicate that the expected document is to be the exclusive operative consumation of the negotiation, their preceding communications will not be operative as offer or acceptance. This also must be shown largely by oral testimony."

In the Colorado annotations of the Restatement, Professor Storke says that Section 26 states the law of Colorado, and he cites Ross v. Smiley (1902) 18 Colo.App. 204, 70 P. 766, and Pierce v. Marland Oil Co. (1929) 86 Colo. 59, 278 P. 804. Finally, and quite importantly, in Coulter v. Anderson (1960) 144 Colo. 402, 357 P.2d 76, while a member of the Colorado Supreme Court, Judge Doyle said:

"The only aspect of these negotiations which even suggests a problem is that of incompleteness of the May 27, 1957 agreement. As to this, the law seems clear that this factor will not prevent the creation of a binding obligation. There are two annotations on this subject, the first of which is reported in 122 A.L.R. 1219, the second in 165 A.L.R. 756. Referring to the earlier annotation, the author of the latter one states:

" 'Many later cases support the general rule (stated in the earlier annotation) that the mere fact that parties to an oral or informal agreement intend that the same shall be reduced to a written or more formal contract will not necessarily prevent present, binding obligations from arising, notwithstanding the contemplated written or formal contract is never drawn up and executed, if the agreement is finally assented to by the parties and covers fully and definitely the terms of the contract; or, as some of the cases, in effect, state the rule, the mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was executed the parol or informal contract should be without binding force. Various other statements of the rule will be found in the cases cited in the footnote.'

"See also the discussion which appears at page 759 to the effect that the intention of the parties is the criterion as to whether supplemental stipulations were necessary in order for the contract itself to be binding. To the same effect is the Restatement of Contracts, sec. 33 and 12 Am.Jur. 758, sec. 235, contracts.

"Therefore, where, as here, the future contemplated writing is not a condition precedent to a contract and the parties intend to be bound regardless of a complete writing, a contract must be held to exist."

Reserving for later discussion questions arising under the statute of frauds and questions of agency, we hold that under the authorities heretofore cited, a contract was entered into between the parties with the intent that it be memorialized by later written agreement unless the evidence shows that Bernstein's tardily raised objections to Isaacson's redraft of the contract demonstrate problems which show that there was no meeting of the minds. We consider those objections seriatim.

■ 1. One of Bernstein's "most serious objections" had to do with a paragraph in the redraft which said that net profits should be determined by public accountants "in accordance with general accepted accounting principles consistently applied . . . which shall be conclusive and binding on the parties." Certainly it is not unreasonable to say that it was an implied understanding that generally accepted accounting principles would be followed, and it is almost standard in modern contracts to say that determinations made by independent public accountants as to accounting matters are to be binding upon the parties. It will be remembered that in the taped telephone conversation between Bernstein and Isaacson, Samelson, Koin's certified public accountant was mentioned more than once and accounting procedures were discussed. Nor should we forget that in that same conversation Bernstein agreed that any procedures for a preacquisition audit requested by Samelson were acceptable to him. And certainly it is important to remember that Bernstein freely admitted at time of trial that Isaacson had said that any differences of opinion concerning his redraft were open to discussion, but Bernstein attempted to discuss nothing and his objections came only after he made his deal with Hughes. In the words of *V'Soske:*

"But it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy. . . . The only term in their original contract upon which the parties later faltered was 'audited net worth.' But that these parties failed to agree as to the valuation of audited net worth does not convince us that the term is intrinsically so difficult to ascertain as to defeat the contract. On the contrary, the term has a well defined meaning and provides a method of valuation by which the exact amount contemplated can be determined."

This negotiable language change proposed by Isaacson did not destroy the prior agreement of the parties.

■ 2. Bernstein's objection as to a provision concerning distribution of the stock sales price among the sellers was of no concern to Ellis, and, obviously, it would have been changed upon request if it was not in accord with the sellers' inter se agreement. No such request was made, and the provision had nothing to do with the agreement between the contracting parties.

■ 3. Bernstein argues that paragraph 4 of the redraft is objectionable. This paragraph consists of typical boilerplate representations and warranties which must have been contemplated by Bernstein, an experienced lawyer and businessman. The representations and warranties were, (a) that the selling stockholders owned the stock they claim to own; (b) that the corporation was duly organized and existing; (c) that United would have good title to its property on the date of closing free and clear of all liens and encumbrances except a first mortgage;[4] (d) that there was no known pending or threatened undisclosed litigation; (e) that there were no restrictions on the stockholders' right to sell the stock; (f) that there were not outstanding profit sharing agreements with employees and (g) that the company was not infringing any patents or trademarks. Most assuredly warranties similar to these were implied in the

---

4. The Chapter XI proceeding insured the good title.

taped telephone conversation and in the exchanges of correspondence. After all, indemnities were specifically mentioned in the taped conversation, and Bernstein told Isaacson that any documentation necessary to protect Koin would be acceptable. Isaacson's request for these representations and warranties was reasonable; it was within the contemplation and agreements of the parties; and, again, everything he proposed was open to negotiation, but Bernstein asked for no further discussion.

█ 4. Bernstein's next objection is pap. His draft said that the sellers would retain physical possession of the shares until the purchase price was paid but that Koin would have the voting rights. Isaacson's draft said that the endorsed shares and new shares would be delivered to a mutually acceptable escrow agent to be delivered by the escrow agent to Koin on payment of the purchase price. [Oddly enough, the agreement Bernstein entered into with Hughes was in accord with Isaacson's draft.]

█ 5. Isaacson's draft gave Ellis the right to cease operations if it became apparent that with the exercise of sound business practices a profitable operating result could not be secured. This gave Ellis no right to arbitrarily close the plant, and, certainly, if the plant was making money it is not likely that it would be closed. However, should Ellis close the plant in bad faith, the sellers would have had a clear claim against Ellis, and Bernstein seems to overlook the fact that if Ellis was not making more than $20,000 per year from its operation of the plant, the sellers would be entitled to nothing anyway. Moreover, this was a typical protective provision authorized by Koin in the taped conversation. This objection is without substance.

█ 6. The critical objection made by Bernstein to Isaacson's redraft is that Isaacson provided that the selling stockholders would be entitled to share in one-half of all profits in excess of $20,000 per year after taxes for only a three year period. Bernstein's draft contained no such time limit, and his draft would have permitted this sharing of profits in perpetuity or until the entire $75,000 was paid. No time limit is mentioned in the taped telephone conversation, nor is there mention of it in any of the correspondence. The testimony of Koin and Bernstein was diametric as to whether the time limit was discussed at their Denver meeting. A memorandum of that conversation made by Koin while it was taking place shows that a time limit was discussed. Isaacson testified that during the October 7, 1970, telephone conversation with Koin, but before the tape recorder was turned on, the three year time limit was discussed. Bernstein denied this. Based upon its observation of the witnesses, its evaluation of all of the evidence in the case and upon the logic of the situation, the Court finds that the three year time limit was discussed during the October 7 conversation and it was agreed upon. As to the logic of the situation, Bernstein had represented that the company should make a minimum of $100,000 per year [it actually earned about that under the Chapter XI], and, although the parties disagree sharply on the tax loss carryforward available to a corporation for which a plan is approved under Chapter XI, under either view there would be some loss carryforward. If the minimum $100,000 were earned, Ellis would get the first $20,000 each year, but this would make $40,000 available annually for payment to the selling stockholders. As phrased, Isaacson's draft actually permitted a 3½ year earnings period to be applied, and with or without tax loss carryforward, if Bernstein's representations were true, the time limitation was fair and reasonable. It is noteworthy that there was apparent discussion of a time limit in Bernstein's talk with Hughes on March 14, 1971, because the typed copy of the memorialization of that agreement fixed a five year time limit on the $100,000 payment to the stock-

holders,[5] just as the remainder of that agreement has a singular similarity to Bernstein's agreement with Koin except for the $25,000 increase in the amount to be paid the stockholders. We repeat, then, that we find that the three year time limit was part of the agreement reached in the October 7, 1970, meeting between Koin and Bernstein, and we mention once more that Bernstein did not request any change in Isaacson's language before he entered into his agreement with Hughes on October 14, or before he wrote his letter of October 16, which said that it would serve to "confirm the agreement reached between us."

■ By repeating in different words some of his objections, Bernstein stretched the foregoing six objections into eight in number, but we have covered all of them in this discussion. We find and we hold that Bernstein's objections were without merit; that they represent afterthoughts to attempt to escape liability for his breach of his contract with Koin; that the additional provisions contained in the Isaacson draft were all open to negotiation if Bernstein had wanted to or had tried to negotiate them;[6] that the provisions suggested by Isaacson had been either expressly agreed to by the parties or were to be reasonably implied from their agreement, and that the objections provide defendants with no escape hatch.

■ We further find that the parties entered into an oral agreement [modified in part by later agreements] which contained all of the essential elements of a contract. They intended that it was to be a binding agreement to be memorialized by later written instrument. That's why Bernstein opened the taped conversation with the words, "The *deal* takes whatever form of documentation you consider necessary for proper protection obviously." If, by that sentence,

Bernstein didn't give Isaacson carte blanche to ask for protective provisions, he certainly gave Isaacson the right to ask for reasonable protective language, and Isaacson did no more than that. And, when experienced businessmen say that they have a "deal" they mean that they have reached an agreement—especially when they set forth the details enumerated by Bernstein in his telephone conversation.

This brings us, then, to the first of our reserved questions—the statute of frauds. The applicable Colorado statute is that contained in Colorado's adaptation of the Uniform Commercial Code, and it appears as '63 C.R.S. 155–8–319, which provides:

"Statute of frauds.—A contract for the sale of securities is not enforceable by way of action or defense unless:

"(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

"(b) Delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

"(c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under subsection (a) of this section has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

"(d) The party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for sale of a

---

5. The typed "five" is scratched out, and "fifteen" is inserted in pen and ink. However, by March 30, the date the written agreement was signed, Bernstein had reason to think he was going to be

sued and had reason to be bolstering his "objections."

6. See, V'Soske v. Barwick (1968), 2 Cir., 404 F.2d 495.

stated quantity of described securities at a defined or stated price."

■ Several of the cases we have already cited and quoted discuss the sufficiency of a memorandum under various statutes of frauds. See, e. g. Barrett v. Book Cliff Railroad Company (1921) 70 Colo. 440, 201 P. 1026; American Mining Company v. Himrod-Kimball Mines Company et al. (1951) 124 Colo. 186, 235 P. 2d 804; D.A.C. Uranium Company v. Benton (1956) D.C.Colo., 149 F.Supp. 667; Carlson v. Bain (1947) 116 Colo. 526, 182 P.2d 526; R. H. Lindsay Co. v. Greager (1953) 10 Cir., 204 F.2d 129; and V'Soske v. Barwick (1968) 2 Cir., 404 F.2d 495. The correspondence signed by Bernstein [especially when taken in conjunction with his draft of the agreement] constitute a sufficient memorandum of the agreement "to indicate that a contract ha(d) been made for sale of a stated quantity of described securities at a defined or stated price." In this connection, it is to be noted that the statute of frauds here applicable ('63 C.R.S. 155-8-319) is more limited in its requirements than are more old fashioned statutes having to do with the sale of goods. Accordingly, we find and we hold that the agreement here meets the test of '63 C.R.S. 155-8-319 under the correspondence signed by Bernstein. But we go a step farther, and we freely concede that the step we take is not supported by any reported case we have been able to find.[7] We hold that when the parties agreed to the tape recording of the oral agreement, that tape recording satisfies the requirements of '63 C.R.S. 155-8-319. This conclusion we reach by taking into account the fact that "[t]he purpose of the statute is to prevent fraud and perjury in the enforcement of obligations depending for their evidence on the unassisted memory of witnesses", 37 C.J.S. Statute of Frauds § 1, p. 513. Moreover, '63

C.R.S. 155-1-201, the definition section of the U.C.C. says:

"(46) 'Written' or 'writing' includes printing, typewriting, *or any other intentional reduction to tangible form.*"

■ We think and we hold that when the parties to an oral contract agree that the oral contract shall be tape recorded, the contract is "reduced to tangible form" when it is placed on the tape. We do not overlook the requirement for signature contained in the statute, but the clear purpose of this is to require identification of the contracting party, and where, as here, the identity of the oral contractors is established, and, in fact, admitted, the tape itself is enough. So, we hold that even if the signed correspondence were insufficient to get around the statute [which it isn't], the tape recording of the oral contract would be a "reduction to tangible form" under the provisions of the U.C.C. Probably the opposite result would be required under historical statutes of frauds which do not contain the tangible form language of this somewhat unusual definition of the word "written." However, under this statute, we think that the tape recorded agreement meets its requirements.

■ Additionally, the requirements of '63 C.R.S. 155-8-319(d) have been here met. Bernstein has admitted in his testimony the accuracy of the tape recorded oral contract, and, accordingly, he has admitted "in his pleading, testimony, or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price." Therefore, for this additional reason the statute of frauds does not bar enforcement of the oral agreement, but there are still other reasons the statute does not give defendants a way out.

---

7. The only mention of the question we have found is a comment in Anderson, Uniform Commercial Code, 2d ed. § 1-201:134, p. 160. The author there predicts the opposite conclusion.

We have already summarized the evidence giving rise to those reasons, and we shall not repeat it here. However, we find and we hold that there was sufficient part performance to take the oral agreement out of the statute and we find and we hold that defendants are estopped from setting up the statute as a bar. 49 Am.Jur. Statute of Frauds, § 581, p. 888; Holton v. Reed (1952) 10 Cir., 193 F.2d 390; Pasotex Petroleum Co. v. Cameron (1960) 10 Cir., 283 F.2d 63 and Oxley v. Ralston Purina Company (1965) 6 Cir., 349 F.2d 328. Moreover, defendants permitted plaintiff to put up the operating capital [albeit it was ultimately paid back with interest] and the management knowhow which put United Packers on its feet, and this management knowhow was part of the sale to Hughes. That being true, as was said in *Pasotex*, supra, in discussing the applicability of a statute of frauds, "The retention and enjoyment of the benefits of the bargain validated the alleged unauthorized part of the transaction."

For all of these reasons, then, the provisions of '63 C.R.S. 155–8–319 afford no defense to this action.

Defendants' claim of lack of mutuality is answered by R. H. Lindsay Co. v. Greager (1953) 10 Cir., 204 F.2d 129, and that argument is rejected by the Court. Their argument that the agreed modifications in the oral agreement amounted to a new counter proposal is answered by *V'Soske*, supra, and the Court disagrees with this contention. Defendants next argue that plaintiff rescinded the agreement when Isaacson asked for and received back the $130,000. This was not a rescission by Isaacson. Bernstein had already agreed to sell to Hughes [and Isaacson had found out about it]. The written agreement with Hughes wasn't signed until after the $130,000 was repaid, but on March 16, 1971, Bernstein wrote Hughes, "This letter will *confirm the agreement reached between us* [on March 14, 1971] for acquisition by you or your nominee of all of the outstanding stock of United Packers, Inc." Isaacson knew that Bernstein had breached the agreement with Koin. Isaacson would have been remiss in performance of his duty to his client, Koin, had he not demanded repayment of the money. One is not required to go along with a defaulting party's wrong to protect the innocent person's rights stemming from the default. No more should Koin be expected to come up with any additional money to be paid to either Bernstein or the Chapter XI after the contract was breached.

None of the defenses raised by defendants can be sustained, and either all defendants are jointly and severally liable for breach of the contract, or Bernstein is alone liable. If Bernstein in fact had no authority actual [express or implied] or apparent, and if Tunick and Stone are not estopped to deny his authority, only Bernstein is liable, but if he had authority or if estoppel applies, all three defendants are liable. Sipes v. Sipes (1930) 87 Colo. 301, 287 P. 284; Bowser v. Union Bag Co. (1944) 112 Colo. 372, 149 P.2d 800. In Amidon v. Bettex (1938) 102 Colo. 162, 77 P.2d 1032, authority of members of a noteholders committee was involved. It was held:

*"The record does not disclose that the note holders were advised of any of the transactions, but such transactions were carried forward by the committee and its authorized representative.* If the committee was authorized by the note holders to enter into the subsequent negotiations which provided for the payment of a commission, and further for certain conditions to be performed by the committee, then, when the committee failed to perform its undeniable part of the contract to the damage of plaintiff, the members thereof became liable individually. If the committee had no authority to enter into the negotiations and agreement with plaintiff, then such negotiations were beyond their authority, and the members again would be individually liable for any attendant damage to plaintiff. If an agent exceeds his authority, by rea-

son of which his principal is not bound by his actions, the agent becomes liable for any damage thereby occasioned to the other party to a contract." [Emphasis supplied.]

■ Although there is evidence in the record which might permit an inference that Bernstein had actual authority to contract for the sale of the stock owned by Tunick and Stone, all of the direct evidence is to the contrary. Bernstein, Stone and Tunick all testified that Bernstein had no such authority and all testified that his authority was limited to authority to negotiate rather than to sell. Nunnally v. Hilderman (1962) 150 Colo. 363, 373 P.2d 940; Stark v. Rogers (1917) 69 Colo. 98, 169 P. 146; Johnson v. Lennox (1913) 55 Colo. 125, 133 P. 744; Springer v. City Bank & Trust Co. (1915) 59 Colo. 376, 149 P. 253. Thus, on the record, the Court cannot find and it does not find that Bernstein had actual authority to sell the stock owned by Tunick and Stone. These two defendants can be held liable if, but only if, Bernstein had apparent authority to enter into the contract or if they are estopped to deny his authority because of their conduct or because of ratification.

Forty years ago it was held by the Tenth Circuit that apparent authority and estoppel were pretty much one and the same thing. In American National Bank of Sapulpa, Oklahoma v. Bartlett (1930) 10 Cir., 40 F.2d 21, Judge McDermott pointed out the uniform rule that for apparent authority to apply, "[t]he party dealing with the agent . . . must be able to trace the authority on which he relies back to some word or deed of the principal." He then continued his discussion of apparent authority:

> "A principal may have so conducted himself that an agent has the *power* to bind him, without having *authority*, either express or implied, so to do. Mechem on Agency (2d Ed.) § 712. Although this is a power, as distinguished from authority, it is commonly called 'apparent authority.' From the

very nature of the rule, it is only available to those who have relied upon the appearance of authority. 'Inasmuch as the whole doctrine of powers by estoppel rests upon the theory that the other party has been led to rely upon appearances to his threatened detriment, it is obvious that the doctrine can apply only in those cases in which this element of reliance was present.' Mechem on Agency (2d Ed.) § 724.

"Williston, in his work on Contracts (volume 1, § 277), under the heading 'Apparent Authority and Estoppel,' says:

> "'An agent may be able to make contracts which will bind his principal not only when actually authorized by express words or implication of fact to do so but also in cases where the principal did not intend to confer such authority on the agent but, nevertheless, held out to the public or to the person with whom the agent dealt an appearance of authority. If one with whom the agent dealt justifiably believed the agent was authorized, and if the facts justifying that belief were due to the conduct of the supposed principal, the latter will be bound.'

"In Jenson v. Toltec Ranch Co. (8 C.C.A.) 174 F. 86, 89, Judge Sanborn held that a corporation which had, by its acts, created an appearance of authority which did not in fact exist, was 'estopped from denying, to the prejudice or injury of those who have acted in reliance upon his apparent authority, that he had actual authority to do acts of a similar nature on its behalf. Martin v. Webb, 110 U.S. 7, 3 S.Ct. 428, 28 L.Ed. 49; G.V.B. Mining Company v. First Nat. Bank, 95 F. 23, 30, 36 C.C.A. 633, 640.' To the same effect see Globe & Rutgers Fire Ins. Co. v. McGinnis (9 C.C.A.) 29 F. (2d) 357; 2 C.J. 465. Without exploring the limits of the rule, it is sufficient to say that its basis is estoppel; its reason is that the courts protect those who have reasonably relied upon

an agent having such authority as the principal has held him out as having."

Most recent cases differentiate between apparent authority and estoppel, although the close relationship between the two is recognized. The Restatement of Agency 2d says in Sec. 8:

"Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."

Comment d to that section is entitled "Apparent authority distinguished from estoppel," and it says:

"Apparent authority is based upon the principle which has led to the objective theory of contracts, namely, that in contractual relations one should ordinarily be bound by what he says rather than by what he intends, so that the contract which results from the acceptance of an offer is that which the offeree reasonably understands, rather than what the offeror means. It follows, therefore, that when one tells a third person that another is authorized to make a contract of a certain sort, and the other, on behalf of the principal, enters into such a contract with the third person, the principal becomes immediately a contracting party, with both rights and liabilities to the third person, irrespective of the fact that he did not intend to contract or that he had directed the 'agent' not to contract, and without reference to any change of position by the third party.

"Estoppel on the other hand, as stated in § 8 B, is essentially a principle in the law of torts developed in order to prevent loss to an innocent person. See §§ 872 and 894 of the Restatement of Torts. Like apparent authority, it is based on the idea that one should be bound by what he manifests irrespective of fault; but it operates only to compensate for loss to those relying upon the words and not to create rights in the speaker. It follows, therefore,

that one basing his claim upon the rules of estoppel must show not merely reliance, which is required when the claim is based upon apparent authority, but also such a change of position that it would be unjust for the speaker to deny the truth of his words. Estoppel is dealt with as a form of deceit, in which the remedy is to hold the speaker to the truth of his statements instead of creating a tort action for misrepresentation. The one estopped is given no rights thereby."

Section 8-B of the *Restatement* says:

"Estoppel—Change of Position

"(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if

"(a) he intentionally or carelessly caused such belief, or

"(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts.

"(2) An owner of property who represents to third persons that another is the owner of the property or who permits the other so to represent, or who realizes that third persons believe that another is the owner of the property, and that he could easily inform the third persons of the facts, is subject to the loss of the property if the other disposes of it to third persons who, in ignorance of the facts, purchase the property or otherwise change their position with reference to it.

"(3) Change of position, as the phrase is used in the restatement of this subject, indicates payment of money, expenditure of labor, suffering a loss or subjection to legal liability."

Comment c to section 8-B is entitled "Estoppel by silence," and it says:

"In many situations one may be . . . subject to an action or even lose his property by failing to reveal the truth if he know that another is acting or will act under a misapprehension. . . . *In situations in which neither authority nor ratification can be found, there may be liability based upon estoppel if the other party has changed his position."* [Emphasis supplied.]

The illustration to this comment is:

"1. P learns that A, who has no authority or apparent authority to sell P's goods, is negotiating with T as P's agent for their sale. He does nothing although he could easily notify T. T pays A for the goods, as is customary in such a transaction. P is not entitled to recover the goods and is liable to T for the breach of any customary warranty given by A."

Distinguishing between apparent authority [Restatement § 8] and estoppel to deny authority [Restatement § 8-B] we hold that there was no apparent authority in Bernstein to bind Tunick and Stone to a contract to sell their stock. There was no direct contact between Tunick or Stone and Koin and there were no manifestations of agency as required by Section 8 of the Restatement.

However, direct contact is not required to permit an estoppel to deny an agency if the tests of section 8-B of the Restatement are met. Here, Tunick and Stone wanted Bernstein to sell the company; they knew he had tried to sell it to various meat packers; they knew it was on the brink of bankruptcy; they knew he was trying to interest Koin in buying the stock; they knew Bernstein met with Koin and Isaacson in Denver to discuss the sale; they were at least generally advised of the substance of the Denver conversations; they received copies of, (a) Bernstein's initial letter to Koin of June 30, 1970, which set forth full financial data and which contemplated a sale of the company to Koin, (b) Bernstein's letter of January 21, 1971, setting forth the amended stock purchase agreement in which it was clearly said that all stockholders were participating in the sale, (c) Bernstein's draft of the sales agreement and of his letter of February 17, 1971, (d) Bernstein's letter to Isaacson of March 18, 1971, which clearly indicates that Isaacson's letter of March 11, 1971, must have been discussed by Bernstein with Tunick and Stone, (e) copies of pertinent information concerning the Chapter XI proceeding, and (f) the agreement with Hughes, signed by Bernstein individually and as agent for all of the stockholders [and this after they knew all of the details of the Hughes sale negotiated by Bernstein.] They were kept advised of the developments in connection with the sale to Koin.

Koin and Ellis most assuredly changed their position because of their belief that the contract was for the sale of all of the stock in United. Not only was the money advanced to the Chapter XI, but the managerial advice was supplied along with the sales volume. A great many man hours were invested in the Chapter XI by Ellis personnel to bring about the profit and loss turnaround and substantial legal expense was incurred by Koin in attempting to close the deal. Change of position was proven beyond peradventure.

If Tunick and Stone did not intentionally lead Koin and Isaacson to believe that Bernstein had authority, they were certainly careless in their handling of the matter. Certainly, with all of the facts they had before them, Tunick and Stone, who were businessmen of long experience, knew that Koin and Isaacson believed Bernstein had the requisite authority, and they not only knew that Koin might change his position, they knew that he had changed his position. Yet, they permitted Koin to invest the money, to invest his time, to invest the time of his personnel and to incur the legal expense, and they happily permitted the Chapter XI operation to receive the benefits of the Ellis business and the Ellis know-how. It comes with poor grace for them to now say that they are not liable because they didn't expressly authorize

Bernstein to represent them, and they are estopped from denying Bernstein's authority. See, Britton v. Mitchell (1966) 10 Cir., 361 F.2d 922; Eitel v. Alford (1953) 127 Colo. 341, 257 P.2d 955.

Bernstein, Tunick and Stone are all liable on the contract of sale.

In awarding damages, certain rules are well settled. Woodburn Bros. v. Erickson (1956) 10 Cir., 230 F.2d 240, holds:

"Generally one injured by a breach of contract is entitled to be compensated for the injury sustained and to be placed in the same position in which he would have been had the contract been performed, less proper deductions."

To the same effect is A to Z Rental, Inc. v. Wilson (1969) 10 Cir., 413 F.2d 899, which adds:

"The rule which precludes the recovery of uncertain damages applies to those that are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect to the amount."

As was said in Bigelow v. R.K.O. Radio Pictures, Inc. (1945) 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."

In United States National Bank of Denver v. Bartges (1949) 120 Colo. 317, 210 P.2d 600, it was said:

"In Story Parchment Co. v. Patterson Paper Co., 282 U.S. 555, 564, 51 S.Ct. 248, 250, 75 L.Ed. 544, the United States Supreme Court said: 'It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.'"

Plaintiffs argue that the reorganized company would earn $100,000 per year; that there was a tax loss carryforward of $200,000 which would make the first $200,000 in earnings tax free; that the first $20,000 earned each year would go to Ellis and that the balance would be split until $75,000 was paid by Ellis. With these premises, plaintiffs say that defendants would be paid off in two years and that Ellis would have received $120,000 from the loss carryforward. Thereafter, plaintiffs reason, the company would have an after tax profit of $59,500 which they capitalize at 10%. From this capitalized figure, they subtract the $80,000 of unrecaptured investment on the part of Ellis, and plaintiffs claim $515,000 in damages. They also claim $3,480 for time spent by Ellis people in the Chapter XI proceeding and they ask $3,225 for Isaacson's services. They claim a total of $521,705 in damages.

Defendants say that anticipated profits do not represent the measure of damages, but, rather, that the measure is the value of the stock involved, and defendants challenge plaintiff's views as to tax benefits available to the corporation reorganized under Chapter XI. Defendants reason that plaintiff's arithmetic simply proves that the parties agreed on a return available on a $200,000 investment; that that return would produce an after tax profit of $59,500, and that when plaintiff got its advances back plus interest, it got back everything which it deserved and that it has suffered no damage at all.

We agree with defendants statement that the damages should be keyed to the value of the stock and we think that profits should be utilized in computing damage only insofar as they enter into a determination of the stock's value. We disagree with both parties as to the amount of damages to be awarded, and

we do not decide the hotly contested tax loss carryforward question under our approach to the damage problem.

Initially, Ellis agreed to pay:

$130,000 for the Chapter XI operation
70,000 for the creditors' arrangement
100,000 for the stock [to be paid out of profits].

As a result of the later agreements, Ellis agreed to pay:

$130,000 for the Chapter XI operation
90,000 for the creditors' arrangement
75,000 for the stock [to be paid out of profits].

In other words, by the amended agreements Ellis increased its firm commitments by $20,000 and reduced its contingent commitments by $25,000. Ellis actually advanced the Chapter XI funds and it incurred the legal expense and the salaries of its employees who got the Chapter XI operation going. Ellis did not advance the money for the creditors' arrangement [although it stood ready to do so] nor did it pay for the stock it had contracted to buy, [because defendants wouldn't sell it] and the money advanced to the Chapter XI operation was repaid Ellis with interest after Hughes made his deal.

 Underlying all rules of damage for breach of contract is the concept that one injured by another's breach is entitled to be placed in as good a position as he would have occupied had the contract been performed. He is entitled to the value of the loss of his bargain. Had the contract been performed, Ellis would have by then invested $295,000 [$300,000 under the original agreement] assuming in both instances that profits were sufficient to pay off the stockholders within the 3-year time period, and the evidence demonstrates that there was every probability of such profits.

 Most assuredly, loss of anticipated profits has been held to be a proper measure of damages in many cases, but application of this measure is always fraught with problems. One must first estimate the amount of gross profit; then net profit has to be guessed at; a time period has to be selected and a present value should be ascertained. Of course, one must then select a proper rate of capitalization. But, this case has the additional problems that the Chapter XI profits of approximately $100,000 per year resulted in substantial part from the Ellis business and that the approximate $100,000 per year Chapter XI profits were reduced by post-Chapter XI claims for defective product.

In an effort to avoid the many problems of keying damages to loss of profits, we apply instead the test of "what could Ellis have sold the company for within a reasonable period of time and without any value being allowed for the Ellis sales volume?" We consider the facts that because of and after the Chapter XI United was a profitable, going concern with or without the Ellis business; that it had acquired the Ellis furnished knowhow; that it had adopted the accounting and managerial methods and procedures supplied by Ellis; and, that as a result of the Chapter XI financed by Ellis, it was debt free. The United stock was readily saleable after the Ellis financing and the Ellis contributions. The sale to Hughes was, to say the least, a quick sale, and it surely does not represent a fair market sale under any conventional definition of that type of sale. The sale was for approximately $25,000 more than Ellis had agreed to pay, and, surely, had Ellis been given an opportunity to manage the company for a while free from the Chapter XI, and had the company stock been offered on the market for a reasonable period of time, an informed purchaser would have paid $400,000 for the business. This amount we arrive at without going through the niceties adopted by appraisers—the estimates of gross profits, net profits, time periods and capitalization rates. The fact of damage from defendants' breach is here certain; it is only the amount of damage stemming from defendants' wrong which is uncertain.

Viewing the evidence in the light most favorable to defendants, the $400,000 sales price is an amount to be reasonably anticipated had Ellis acquired the stock and had it within a reasonable time thereafter sold the stock on the open market. That being true, we find the dollar value of Ellis' loss of its bargain was $105,000.00.[8] Additionally, Ellis claims $3,480 for salaries of Ellis employees who straightened out United's accounting and managerial procedures, and it claims $3,225 for payments made to Isaacson for his legal services in attempting to consummate the sale. These amounts we do not allow. We find that the expenses were incurred, that they were reasonable, and we would allow them if we were not awarding damages for loss of bargain. However, we treat these damages as a part of the cost of acquisition had the contract been performed. The employees' services contributed to the increase in stock value to $400,000, and, to a lesser degree, so did Isaacson's services. Thus, their value has been allowed in a sense in the $400,000 value figure. These expenses are part of the knowhow. We look at the value of Isaacson's services as being comparable to organization expense of a new corporation, and, of course, such expenses should be capitalized.

In conclusion, then, we find that as a result of defendants' breach of their contract with plaintiff, Ellis has been damaged in the amount of $105,000.00, and we direct the entry of judgment in favor of plaintiff and against all defendants in the amount of $105,000.00, plus interest as provided by law. Plaintiff is awarded its costs.

It is intended that this memorandum opinion shall constitute the findings and conclusions required by Rule 52, and no separate findings and conclusions will be filed. Counsel for plaintiff are directed to submit within 10 days a form of judgment in accordance with this opinion.

8. This amount we arrive at by deducting from the $400,000 sales price found to be reasonable the $295,000 Ellis would have

had invested in the company had defendants performed their contract.