No. 17,914.

D. E. WEAVER, AS LIMON LIVESTOCK SALES COMPANY *v.* FIRST NATIONAL BANK OF LIMON, ET AL.
(330 P. [2d] 142)

Decided September 22, 1958.

Mr. BENJAMIN E. SWEET, for plaintiff in error.

Messrs. KREAGER & SUBLETT, Mr. GRAYDON F. DOWIS, JR., for defendants in error Security State Bank of Sterling, First National Bank of Denver and Federal Reserve Bank of Kansas City.

Mr. JOSEPH COREY, for defendant in error Earl Goodwin.

Mr. BEN L. WRIGHT, JR., for defendant in error Charles Watson.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

ONE Sparks (who does not appear in these proceedings on error) brought suit against Watson to replevy twenty-three cows in the latter's possession. Watson answered, denying Sparks' claim of ownership. By third party complaint Watson sued Weaver, who sold him the cows through his licensed livestock sales ring. Watson's claim was predicated on breach of warranty of title to the cows. Recovery of $3128, the amount he had paid Weaver for the cows, and $750, said to be the reasonable value of feed, care and transportation of the animals, plus a reasonable attorney's fee, was the objective of this third party complaint.

In his answer Weaver admitted the sale of the cows but denied the warranty. Weaver filed a third party complaint against Todd, Goodwin, and the First National Bank of Limon. The alleged liabilities of these third party defendants were disparate: Todd's was based upon his delivery of the cows to Weaver's sales ring as the pretended agent of a non-existent, fictitious owner by the name of Roy Nelson; Goodwin's, on negligence in failing to properly inspect brands and in certifying, as brand inspector, ownership of the cows in Nelson; and the Bank's, on having honored Weaver's check made

payable to Nelson and delivered to Todd and charging the amount thereof against his account in said bank, on the ground that the endorsement of said check was a forgery.

Todd was not served with process and did not appear. Goodwin denied that he was negligent. The First National Bank of Limon admitted in its answer that it honored the check and charged it against Weaver's account, but denied that the endorsement was a forgery. The Limon bank then filed its third party complaint against the Security State Bank of Sterling, the First National Bank of Denver, and the Federal Reserve Bank of Kansas City, asserting that said banks were each liable on their guaranties of prior endorsements on the check and that if judgment be entered against it, it should be entitled to judgment against said banks.

The Security State Bank filed its answer in which it denied liability on the endorsement; alleged that the negligence of Goodwin was the proximate cause of Weaver's loss; asserted that Weaver was estopped to deny the forgery, and that he was negligent in drawing and delivering the check; averred that Weaver was negligent in failing to give prompt notice to the Limon bank, and that the First National Bank was negligent in failing to give prompt notice of the loss, to its damage. By cross-claim the Security State Bank sought damages against Todd in the event it was adjudged that the endorsement was forged.

The First National Bank claimed against the Security State Bank on its endorsement, and the Federal Reserve Bank claimed against the First National Bank of Denver and the Security State Bank on their guaranties of endorsement.

Trial of these issues was to the court. At the conclusion of the evidence on November 17, 1955, the trial court heard extended argument, after which it took the matter under advisement. On December 19, 1955, the court

made formal findings of fact and conclusions of law, and thereon entered its decree.

In the trial court's disposition of the case, Sparks prevailed against Watson in his replevin suit, and Watson obtained judgment against Weaver in the sum of $4539.38 plus interest from November 17, 1955. Goodwin was exonerated of the charge of negligence, and the banks were not held answerable for the claims lodged against them.

Dissatisfied with the decision of the trial court, Weaver prosecutes his writ of error. He contends that the trial court erred in holding (1) that Weaver warranted title to the cows; (2) that Weaver was liable to Watson; (3) that Goodwin was not negligent; (4) that the First National Bank of Limon was not liable in honoring Weaver's check and charging his account therewith on a forged endorsement; and (5) that the intermediary banks were not liable on their guaranties of prior endorsements.

Weaver owned and operated a licensed livestock sales ring at Limon, Colorado. Twenty-five white-faced cows were delivered to his sales ring. Todd represented that he was the agent of one Roy Nelson, the owner of the cows, who desired to have them sold through the sales ring. Twenty-three of these cows are involved in the instant suit.

Among instruments presented to Goodwin, the state brand inspector, was the following document:

— — — — — — — — — — — — — — — — — — — — — — — — —

Compliments J. I. HAWLEY, Denver

Colorado, County of........*Morgan*........Dated....*1-27*....*19*....*53*
    This is to certify that I have
this day sold and delivered to.............*Roy Nelson*.............
of ............................................ *Brush, Colo.* ...................................
certain livestock described below, the title to which I hereby transfer and guarantee to defend against all lawful claims, for $1.00 and other value received.

| No. Head | Kind | Description and Brands | |
|---|---|---|---|
| 25 | Cows | White faces | Branded....20....D. |

Seller Sign: ..............................._Carl Werzmen_..............................
P.O. Address: ..............................._Chapell, Neb_..............................
Buyer Sign: ..............................._Roy Nelson_..............................
P.O. Address: ..............................._Brush, Colo_..............................
Witness Sign: ..................................................................................................
P.O. Address: ..................................................................................................

(Livestock Only)

Goodwin inspected these cows with the aid of another brand inspector. Some bore a *"20"* brand, others a "D" brand on the left shoulder, left rib and left hip. As to the latter only the "D" brand on left hip was noted. Goodwin did not resort to his official brand book to ascertain in whose name the brands appearing on these animals were registered. Had he done so, he would have learned that the brands were registered in the name of Sparks.

In reliance upon the inspection made by Goodwin, the cows were placed in the sales ring and sold to Watson, who paid Weaver $3128.00 for them. Weaver in turn drew a check on his account in the First National Bank of Limon, payable to Roy Nelson. There is no direct evidence in the record showing to whom the Weaver check was delivered.

Weaver's check was presented to the Security State Bank of Sterling by Todd, who was well known by the bank. The bank paid the check in cashier's checks and cash.

On the reverse side of the check thus presented to the bank appeared a signature, "Roy Nelson," and below this signature was the endorsement of Todd. Through intermediate banks the check came back to the drawee bank at Limon. These intermediate banks had guaranteed the endorsements.

On or about March 16, 1953, about six weeks after the sale, it was discovered that these cows had been stolen

from Sparks. Demand was made upon Watson for their return. The demand proving ineffectual, Sparks initiated these proceedings by his suit in replevin against Watson. Watson had notified Weaver of the demand, and the latter thereupon notified the First National Bank of Limon that the cows had been stolen and that Roy Nelson was not in fact the owner.

Upon the theory that the endorsement of Roy Nelson was a forgery, Weaver demanded that the money paid out by the First National Bank of Limon be returned to his account. The First National Bank of Limon thereafter notified the Security State Bank at Sterling of the demand made upon it.

We will consider first the question of the liability of Weaver to Watson. The trial court found that Weaver had warranted the title to the twenty-three cows; that said warranty was breached; and that Watson was entitled to recover damages, as follows: the price paid for the cows, the expense to which Watson was put in transporting them from the sales ring to his ranch and there feeding and caring for them, plus a reasonable attorney's fee.

It is the position of Weaver that he was not the warrantor of title to the cows because his relationship was that essentially of agent to the principal, the seller of the cattle, and that if he was a warrantor, he was not chargeable with a reasonable attorney's fee.

The general rule is that a person employed as an auctioneer at a sale of property is primarily the agent of the owner or vendor. *Wright v. May,* 127 Minn. 150, 149 N.W. 9, L.R.A. 1915 B. 151; *Green v. Cyre,* 158 Tenn. 109, 11 S.W. (2d) 869. But we are dealing with a creature recognized by and licensed under the statutes of this state. To operate a livestock sales ring, one must receive the sanction of the state to do so, and must accept the limitations, duties and responsibilities which the statutory law imposes. C.R.S. '53 8-11-1 et seq.

Plain words make plain meaning. We believe the

statute in plain words creates a statutory warranty, and that the operator of a sales ring, if he wishes to pursue such a business, undertakes to warrant title to livestock he sells in the course of such business.

C.R.S. '53, 8-11-12, directs the brand inspector to make brand inspections of livestock entering a sales ring, collect certain fees therefor, and thereupon to issue a "certificate in duplicate, one copy to be the property of the owner or operator of the auction sales ring" which shall be authority to the owner or operator to issue "a bill of sale guaranteeing clear title to the purchaser of any livestock sold or disposed of through [the] licensed livestock auction ring."

If it means anything, C.R.S. '53, 8-11-14, places an even greater responsibility on the licensed operator; it requires the operator of each livestock sales ring in this state to "warrant to the purchaser thereof the title of all livestock sold through" his sales ring and makes him "liable to the rightful owner thereof for the net proceeds in cash received" for livestock sold.

The deviation from the statute, such as it is maintained existed by virtue of certain instruments in this case, would be of no avail; the statute prevails and the liability is that fixed thereby. This compels a holding that Weaver in selling the cows was a warrantor of the title to the cows by virtue of the statute under which he operated his sales ring. In so holding, we merely follow the familiar rule that the law existing at the time the contract is made becomes part of it. *First Nat'l Bank v. Arthur,* 10 Colo. App. 283, 50 Pac. 738.

Under the circumstances of this case the expense occasioned by the employment of counsel is attributable to Weaver's breach of the warranty of title to the cows. The attorney's fees constitute a part of the damage which plaintiff sustained in consequence of such breach. *Balte v. Bedemiller,* 37 Or. 27, 60 Pac. 601, 82 Am. S.R. 737; *Lipsie v. Dickey,* 375 Pa. 230, 100 Atl. (2d) 370.

Next we shall consider the question of the liability of

Goodwin. His duty under the statute is two-fold: toward the state as his employer and toward the livestock sales ring operator who is required by the statute to rely upon his inspection and certification.

The so-called bill of sale can be the source of no solace to Goodwin. It indicates that it was made in the County of Morgan, Colorado, thereby suggesting the involvement of property having a situs in this state. At the very least it should have provoked an investigation and a more thorough inspection of the brands appearing on the cows.

Each brand inspector is supplied with a book of registered brands, and with supplements containing additional brands or changes in the ownership of brands. C.R.S. '53, 8-2-8.

A recorded brand is property which "shall be subject to sale, assignment, transfer, devise and descent, as personal property." "The recording of such instruments of writing shall have the same force and effect as to third parties as the recording of instruments affecting real estate and a certified copy of the record of any such instrument may be introduced in evidence the same as is provided for the certified copies of instruments affecting real estate." C.R.S. '53, 8-2-9.

It has been held that "the brand on an animal shall be prima facie evidence of the ownership of the animal by the person owning the brand, provided the brand has been duly recorded as required by law." *Debord v. Johnson,* 11 Colo. App. 402, 53 Pac. 255. " 'In all suits at law or in equity, or in any criminal proceedings, when the title of any stock is involved, the brand on an animal shall be prima facie evidence of the ownership of the person whose brand it may be: provided, that such brand has been duly recorded as provided by law.' " *Chestnut v. People,* 21 Colo. 512, 42 Pac. 656. See *Howry v. Sigel-Campion Co.,* 80 Colo. 143, 249 Pac. 658; *Cahill v. People,* 111 Colo. 29, 137 P. (2d) 673, 148 A.L.R. 536.

The cows entered in the sales ring were owned

by a Coloradan, had been taken off his ranch in Colorado, and bore the brands of "the rightful owner." These brands were recorded as required by law; they established prima facie ownership in Sparks. Failure to resort to the brand book to determine the ownership of the animals in question was, under all the circumstances of this case, negligence for which Goodwin is liable. To whatever extent Weaver was answerable in damages Goodwin should make him whole, for his negligence in failing to make a proper inspection is the proximate cause of the wrongful sale and consequent loss to Weaver.

There remains the question of the asserted liabilities of the several banks. Since the liabilities of the intermediary banks, if any, depend upon the resolution of whether the First National Bank of Limon (the drawee) is liable to its depositor (the drawer of the check) for having honored the check under the circumstances, we shall undertake such resolution.

In the summary of argument appearing in his brief, Weaver contends:

"4. The signature 'Roy Nelson' on the check was a forgery. The check was intended for a man whom Goodwin certified and Weaver believed was *owner of the cows* — by the name of 'Roy Nelson'. Since Sparks was the owner, no 'Roy Nelson' could have been the owner, and the name 'Roy Nelson' was fictitious [sic] — therefore a forgery — and the Limon Bank is liable to Weaver for the amount of the check ($3128) plus interest.

"5. It is of no consequence whether or not there was a person bearing the name of Roy Nelson who endorsed the check since he was not the person for whom the check was intended. Just *any* Roy Nelson is not sufficient. It is not incumbent upon Weaver (drawer) to prove *who* put the name 'Roy Nelson' on the check. It is sufficient to prove forgery that the *Roy Nelson* in-

tended by Weaver to receive payment did not endorse the check.

"6. The check was not presented by an 'imposter as the payee', but by one (Todd) who represented and induced Weaver to believe that he was the agent of the payee. As this Court has recently said (Harsin Motor Co. vs. Trust Co. — 131 Colo. 595, 600.) — 'the loss — falls upon the drawee, where the imposter upon whose endorsement the paper was paid represented himself to be the agent of the payee and not the payee himself.' "

To correctly resolve the question of the liability of the First National Bank of Limon requires a consideration of the impostor or fictitious payee rule and its limitations. Perhaps the best statement of this rule is that contained in 7 Am. Jur. 435, §599. We quote:

"While the decisions upon the question of the right of the bank to pay the check to the impostor or on his indorsement are not entirely consistent, according to the weight of authority, where the drawer of a check has dealings with an impostor who assumes a false name, and the check is intended for the person with whom the drawer is dealing, payment of the check by the bank to such impostor or on his indorsement will be authorized and binding upon the depositor. In such cases the principle that, as between two innocent persons, the one whose act was the cause of the loss should bear the consequences applied. The transaction begins with the depositor, and it is his duty to use diligence to ascertain the identity of the party with whom he deals. The bank has a right to believe that the depositor has acted with full knowledge of the party to whom he gave the check for the money, and its duty to him is discharged when it satisfies itself that the payment was intended to be made to the party who presented it. Also, in such a case the intention with which the drawer issued the check has been carried out. The person has been paid to whom he intended payment should be made. There has been no mistake of fact except the mistake which he made when

he issued the check, and the loss is due, not to the bank's error in failing to carry out his intention, but primarily to his own error, into which he was led by the deception previously practiced upon him."

In *Boatsman v. Stockmen's Nat'l Bank,* 56 Colo. 495, 138 Pac. 764, 50 L.R.A.N.S. 107, appears a felicitous exposition and application of the rule. In this connection see also *Schweitzer v. Bank of America N.T. & S.A.,* 42 Cal. App. 536, 109 P. (2d) 441; *Defiance Lumber Co. v. Bank of California,* 180 Wash. 533, 41 P. (2d) 135, 99 A.L.R. 426.

The impostor or fictitious payee rule is circumscribed in its application to a limited area. Three situations have arisen in cases in which the restricted sphere of the operation of the rule is made apparent. They aid greatly in understanding the rule and its application.

The first is discussed in 7 Am. Jur. 436, §600, the text of which is: "A distinction which has been drawn and generally accepted is that between the case where a check is delivered directly to an impostor as payee, and the case in which the check is delivered to an impostor upon the representation and in the belief that he is the agent of the person named as payee, even though the latter is a fictitious or nonexistent person, or at least a person who has no connection with the transaction; in the latter case, as between the drawer and the drawee, the loss — at least in the absence of conduct estopping the drawer or negligence upon his part — falls upon the drawee, where the impostor upon whose indorsement the paper was paid represented himself to be the agent of the payee and not the payee himself." The law thus enunciated was adopted verbatim in *Harsin v. Colorado Savings & Trust Co.,* 131 Colo. 595, 284 P. (2d) 235.

No better statement of the second limitation can be found than that appearing in 7 Am. Jur. 436, §601, which is as follows: "A check made payable to a fictitious person with the knowledge of the drawer is payable to bearer, and a bank which pays the check is protected in

its payment to anyone presenting it. On the other hand, a check which is made payable to a fictitious person with out the knowledge of the maker is not payable to bearer, and it is the duty of the bank, before paying it, to ascertain the existence and the identity of the payee and, failing to do so, to refuse its payment. Moreover, in such case, the negligence of one drawing a check payable to a fictitious person is immaterial on the question of the liability of the bank for paying it, unless it directly and proximately affects the conduct of the bank in making the payment."

In 51 Commercial Law Journal 137 (1946) we find an expression of the third limitation in these words: "(c) The third limitation to the Impostor Rule is that where there are two innocent persons, both of whom are victims of a fraud, then the burden must fall upon the one whose negligence first facilitated and made possible the loss by some initial act or conduct." Recognition of the third situation appears in *Boatsman v. Stockmen's Nat'l Bank,* supra, and *Defiance Lumber Co. v. Bank of California,* supra.

The impostor or fictitious payee rule may be invoked by the bank (upon which a check has been drawn) in defense of a suit by the drawer of the check charging that the check was paid by the bank on a forged indorsement. 51 Commercial Law Journal 137 (1946). And the bank will be successful in making such defense where it is made to appear that the check was drawn and delivered to an impostor in the mistaken belief that he was the person whose name he had assumed and to whose order the instrument was made payable, and the drawee bank had paid it on the impostor's indorsement. In such case the bank is not liable, for it paid the intended person, even though the intended person was in fact an impostor.

But, in the instant case there is nothing in the evidence to show to whom Weaver delivered the check. In the circumstances C.R.S. '53, 95-1-16, becomes rele-

vant to a resolution of the problem. *This section pro-vides:* "* * * Where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved."

Since both parties treat the payee of the check as an impostor, and there is no evidence of delivery of the check, it will be presumed that the check was delivered to Nelson by Weaver, to the latter's fault and the bank's exoneration.

There is no solace for Weaver in the limitations of the impostor rule. Be it remembered that there is no show-ing made regarding the person to whom the drawer de-livered the check. In the absence of evidence showing that Todd procured a delivery of the check to himself as the agent of the fictitious payee Nelson, Weaver's de-pendence on the limitations of the impostor rule must fail.

■ Formal determination of this case was made on December 19, 1955. The trial court adjudged that Wat-son was entitled to interest and related it back to No-vember 17, 1955, the date on which the court took the case under advisement. Interest should have started running from the date of the entry of the judgment. C.R.S. '53, 73-1-2. The right to interest, independent of an agreement to pay it, is statutory. C.R.S. '53, 73-1-2, enumerates the cases in which it may be awarded. *Denver, Etc. Railroad Co. v. Conway,* 8 Colo. 1, 5 Pac. 142, 54 Am. Rep. 537; *Greeley, Etc. Railroad Co. v. Yount,* 7 Colo. App. 189, 42 Pac. 1023. "An action in damage for a breach of warranty is not one of the enum-erated cases." *Denver Horse Importing Co. v. Schafer,* 58 Colo. 376, 147 Pac. 367. See *Schlottman v. Pressey,* 195 F. (2d) 343, in which the Denver Horse Importing case is followed.

The cause is remanded to the trial court with instruc-tions to modify the judgment in favor of Watson and against Weaver to include interest only from the date of

the entry of the decree, and to enter judgment in favor of Weaver against Goodwin in such sum as Watson is adjudged entitled to against Weaver. In all other respects the judgment of the trial court is affirmed.

MR. CHIEF JUSTICE HOLLAND and MR. JUSTICE DAY dissenting.

MR. JUSTICE MOORE not participating.