**I.M.A., INC., a Colorado corporation, Petitioner,**

v.

**ROCKY MOUNTAIN AIRWAYS, INC., a California corporation, Respondent.**

**No. 83SC260.**

Supreme Court of Colorado, En Banc.

Jan. 13, 1986.

Rehearing Denied Jan. 31, 1986.

Kelly, Haglund, Garnsey & Kahn, Edwin S. Kahn, Norman D. Haglund, Denver, for petitioner.

Shoemaker, Wham & Krisor, Robert S. Wham, Denver, for respondent.

LOHR, Justice.

I.M.A., Inc. (I.M.A.) brought suit in Denver District Court against Rocky Mountain Airways, Inc. (Rocky Mountain) alleging that Rocky Mountain had breached a contract between the two parties. I.M.A. asserted that the alleged contract obligated Rocky Mountain to purchase all of the outstanding stock of I.M.A. and, as part of the purchase price, to assume I.M.A.'s liabilities. A jury returned a general verdict for I.M.A. and awarded $300,000 damages. The Colorado Court of Appeals reversed, holding that no contract existed. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 80CA0964 (May 26, 1983) (not selected for official publication). We granted certiorari in order to determine whether the court of appeals erred in concluding as a matter of law that the parties did not enter into a contract. We reverse the judgment of the court of appeals and remand with directions.

I.

In 1977, I.M.A., formerly known as Intermountain Airways, Inc., began service as a commercial airline and air taxi between Denver and Durango, Colorado. It operated pursuant to a certificate of public convenience and necessity issued by the Colorado Public Utilities Commission (PUC). By 1978, however, I.M.A. was already encountering grave financial difficulties. After losing support from its major financial backer, I.M.A. ceased operations in July 1978 without seeking PUC approval. I.M.A. then engaged in discussions with Aspen Airways to explore the possibility of a takeover. While negotiations between these two companies were in progress,

Rocky Mountain expressed interest in acquiring I.M.A. and thus obtaining the right to utilize I.M.A.'s certificate of public convenience and necessity to provide service between Denver and Durango. I.M.A. discontinued its negotiations with Aspen Airways and concentrated on reaching an agreement with Rocky Mountain.

On August 1, 1978, the presidents of Rocky Mountain and I.M.A. signed a "Letter of Intent and Agreement," drafted by Rocky Mountain, the stated purpose of which was "to confirm [the parties'] recent understandings as to the acquisition of the assets of I.M.A. by Rocky Mountain Airways, Inc." According to the letter, Rocky Mountain intended "to acquire all of the assets of I.M.A. through acquisition of [all of I.M.A.'s outstanding stock]," and as consideration, Rocky Mountain agreed to assume I.M.A.'s liabilities and to pay a three dollar fee per passenger emplaning at Durango on the Denver to Durango route "to be credited ... to the shareholders [of I.M. A.]." The fee was to be increased to four dollars per Durango passenger upon satisfaction of specified contingencies. Payment of the passenger fees was to continue for no longer than five years and was not to exceed $300,000. As part of Rocky Mountain's agreement to assume I.M.A.'s liabilities, the letter specified that Rocky Mountain would establish an escrow or trust fund in the amount of $20,000 within seven days for the purpose of providing assurance to taxing authorities that I.M. A.'s payroll tax obligations would be paid.[1]

In the letter, I.M.A. represented that its liabilities totaled approximately $100,000 and its immediately redeemable assets were valued at approximately $45,000. I.M.A. promised to provide Rocky Mountain with a detailed list of its creditors and to update its accounting records for Rocky Mountain's inspection. The parties made no provision for the possibility that the accounting update might show I.M.A.'s as-

sets or liabilities to be different from the approximate amounts represented. The letter also stated that "this Letter of Intent and Agreement is preliminary in nature, and ... each party will work toward more definitive statements and the execution of agreements and resolutions and contracts, that may be required to consummate the overall purposes of this intent and agreement letter."

The letter listed five requirements upon which the "understanding and agreement and intent to acquire the assets" was contingent: 1) approval of the transfer of control of I.M.A. by the PUC and the Civil Aeronautics Board, 2) approval of Rocky Mountain's board of directors "and of the shareholders, if required," 3) approval of I.M.A.'s board of directors and shareholders, 4) suitable renegotiation of I.M.A.'s lease for the use of the Animas Air Park, which was the Durango airport that I.M.A. serviced, including a list of specified changes to be made in the lease, and 5) ability of Rocky Mountain to carry forward I.M.A.'s net operating loss. Rocky Mountain deleted this last requirement in another letter, entitled "Letter of Intent and Agreement Modification and Amendment," which was dated August 3, 1978, and signed by the presidents of both corporations. The second letter also established a modified schedule of emplaning passenger fees, but retained the $300,000 limit on the total fees to be paid by Rocky Mountain. In addition, it specified that an existing promissory note made by I.M.A. in the approximate amount of $160,000 and any I.M.A. notes held by I.M.A. shareholders were to be paid from the passenger fees.

Subsequent to the signing of these letters, several events occurred. On August 11, 1978, I.M.A. entered into a written lease agreement with Rocky Mountain whereby I.M.A. leased its PUC certificate of public convenience and necessity to Rocky Moun-

---

1. Although the contemplated transaction combines traditional features of an acquisition of stock with those of a purchase of assets, its central terms and purpose are clear. Rocky Mountain was to obtain control of the certifi- cate of public convenience and necessity, assume responsibility for I.M.A.'s liabilities, and pay a prescribed amount for the benefit of I.M.A. shareholders based upon passengers emplaning at Durango.

tain for $500 per month. One purpose of this lease agreement was to enable Rocky Mountain to restore service promptly on the Denver to Durango route. This was important to reduce the possibility of cancellation of the certificate of public convenience and necessity because of the failure of I.M.A. to continue the authorized service or to obtain PUC approval for the interruption. The lease agreement included a promise by I.M.A. to assist Rocky Mountain in obtaining PUC approval of the lease agreement and in establishing service on the Denver to Durango route. By another provision of the lease agreement, I.M.A. and Rocky Mountain acknowledged that the parties had "reached an agreement as to the acquisition of the stock of I.M.A." and that the lease would be subject to renewal until such time as the PUC approved the stock acquisition. On August 15, 1978, the PUC granted emergency temporary approval of the lease, thus allowing Rocky Mountain to begin servicing the Denver to Durango route. Rocky Mountain soon commenced operations on the route.

During the month of August, I.M.A.'s president, Wiebe Gortmaker, traveled to Durango to build public support for Rocky Mountain's acquisition of I.M.A.'s Denver to Durango route and to attempt to persuade Animas Air Park to renegotiate I.M.A.'s landing lease.[2] I.M.A. also obtained, by mail, its shareholders' ratification "in concept" of the proposed stock sale "on substantially the terms and conditions expressed in the attached letters of August 1, 1978 and August 3, 1978." In the meantime, the parties moved I.M.A.'s furniture and office equipment to Rocky Mountain's hangar at Stapleton airport in Denver.

In late September of 1978, I.M.A.'s bookkeeper completed the updating of I.M.A.'s financial records. This led to the discovery

that I.M.A.'s liabilities totaled approximately $37,000 more than the company had originally estimated. I.M.A.'s president offered to adjust the allocation of the purchase price so that I.M.A.'s shareholders, and not Rocky Mountain, would bear the cost of satisfying these additional debts. On October 4, 1978, Rocky Mountain's president, Gordon Autry, informed I.M.A. that Rocky Mountain no longer wanted to acquire I.M.A. According to Autry, he advised I.M.A. that the decision not to pursue the acquisition was based primarily on Rocky Mountain's discovery that I.M.A.'s liability and asset position was "a great deal different than that represented." He also stated that market conditions, the existence of two other carriers providing service between Denver and Durango, and the prospect of deregulation of the airline industry pursuant to pending federal legislation[3] were additional reasons that Rocky Mountain had no further interest in the acquisition of I.M.A.

Following Rocky Mountain's refusal to proceed with the acquisition, I.M.A. commenced the present lawsuit. I.M.A. claimed damages for breach of contract, deceit, and unjust enrichment.[4] It contended that the August letters constituted a binding contract and that I.M.A. had performed its obligations under the contract. It further averred that Rocky Mountain had never intended to consummate the transaction, but had allowed I.M.A. to rely on Rocky Mountain's representations that it would complete the acquisition. Finally, I.M.A. asserted that by using the PUC certificate and obtaining the attendant competitive advantages in serving the Denver-Durango market, Rocky Mountain had been unjustly enriched.

In response, Rocky Mountain contended that the August letters were merely pre-

---

2. Rocky Mountain agreed that Gortmaker should receive a salary for performing these tasks, but the parties disagree as to whether Gortmaker was employed by I.M.A. or by Rocky Mountain during this time.

3. The evidence indicates that the effect of deregulation would be to eliminate the need for the

PUC certificate of public convenience and necessity held by I.M.A., thus inferentially making the principal asset of I.M.A. of little or no value.

4. In its original complaint, I.M.A. sought specific performance. It later amended the complaint to seek damages only.

liminary and did not constitute a contract. Rocky Mountain further asserted that I.M.A. had materially misrepresented its financial position, that the parties were unable to resolve the new issues posed by the erroneous representations, and that, therefore, I.M.A. and Rocky Mountain were unable to "formalize" an agreement. Rocky Mountain also denied the averments of deceit and unjust enrichment.

At the close of the defendant's case, the trial court directed a verdict for Rocky Mountain on I.M.A.'s deceit claim, but it submitted the breach of contract and the unjust enrichment claims to the jury. The jury returned a general verdict of $300,000 for I.M.A. Rocky Mountain appealed, and I.M.A. cross-appealed the trial court's denial of prejudgment interest.

The court of appeals decided that the trial court erred when it denied Rocky Mountain's motion for a directed verdict on I.M.A.'s breach of contract claim. The court of appeals held that the trial court should have resolved the question of contract formation as a matter of law by looking at the two August letters. The court of appeals' own review of these two documents convinced it that Rocky Mountain and I.M.A. had contemplated further negotiations and had not entered into an enforceable contract. Because we conclude that the trial court properly allowed the jury to determine whether a contract between I.M.A. and Rocky Mountain existed, we reverse the judgment of the court of appeals.

## II.

■ The court of appeals concluded that no contract existed between Rocky Mountain and I.M.A., based on its own interpretation of the letters of August 1 and August 3. Although the interpretation of an established written contract is generally a question of law for the court, *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984), and thus subject to independent reevaluation by an appellate court, *Radke v. Union Pacific Railroad Co.*, 138 Colo. 189, 195, 334 P.2d 1077, 1081 (1958), we have stated previously that it is for the jury to determine whether the parties have entered into a contract. *Babcock v. Bouton*, 85 Colo. 327, 331–32, 275 P. 908, 910 (1929). *See also Bruce Hughes, Inc. v. Ingels & Associates, Inc.*, 653 P.2d 88, 89 (Colo.App.1982); 3 A. Corbin, *Contracts* § 554 (1960 & Supp. 1984). More precisely, when the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists. *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 679 P.2d 640, 645 (1984); *Arrowhead Construction Co. v. Essex Corp.*, 233 Kan. 241, 662 P.2d 1195, 1201 (1983); *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees*, 681 P.2d 1326, 1330 (Wyo.1984). Appellate courts are bound by a jury's findings when the jury has been properly instructed by the trial court and there is competent evidence in the record to support the findings. *Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo.1981); *Vigil v. Pine, Jr.*, 176 Colo. 384, 387, 490 P.2d 934, 936 (1971). Application of these general principles to the present case yields the conclusion that the evidence and the law support a jury determination that I.M.A. and Rocky Mountain had entered into a contract.

■ In the present case, the evidence pertaining to the question of whether I.M.A. and Rocky Mountain had entered into a contract permitted a trier of fact to draw more than one inference. Thus, the trial court properly assigned the task of determining this question to the jury.[5]

---

**5.** The court of appeals stated that by denying Rocky Mountain's motion for a directed verdict, the trial court had implicitly found, as a matter of law, that the two August letters constituted an enforceable contract. The denial of the motion, however, merely reflected the trial court's determination that the jury could reasonably conclude that Rocky Mountain and I.M.A. had entered into a contract and that Rocky Mountain had breached that contract. A motion for a directed verdict can only be granted when the evidence, considered in the light most favorable to the party against whom the motion is directed, compels the conclusion that a jury verdict

■ The court instructed the jury without objection that in order to award damages on the breach of contract claim, the jury was required to find, among other things, that Rocky Mountain had entered into a contract with I.M.A. to purchase I.M.A.'s assets or stock. The trial court further instructed the jury that "[t]o enter into a contract, each party must understand and agree to the essential terms and conditions of the claimed contract. Such agreement, if any, may be inferred from the conduct and declarations of the parties."

■ This instruction correctly stated the law. In order to establish the existence of a contract, the evidence must show that the parties agreed upon all essential terms. *Federal Lumber Co. v. Wheeler,* 643 P.2d 31, 36 (Colo.1981). The parties' agreement is evidenced by their manifestations of mutual assent. *See* Restatement (Second) of Contracts § 17(1) (1981) ("[t]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange...."). Furthermore, evidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties. *See Miller v. L.C. Fulenwider, Inc.,* 146 Colo. 588, 594–95, 362 P.2d 570, 574 (1961); *Pierce v. Marland Oil Co.,* 86 Colo. 59, 63, 278 P.804, 805 (1929).[6] Thus, the instruction given by the trial court properly allowed the jury to determine the existence of a contract between I.M.A. and Rocky Mountain and to consider all the evidence in the record before it in making that determination.

After considering all of the evidence, including the two August letters, the lease agreement provision that referred to the stock purchase agreement, the moving of I.M.A.'s furniture to Rocky Mountain's offices, and I.M.A.'s actions in obtaining its shareholders' approval and in assisting Rocky Mountain to obtain PUC approval and community support, the jury reasonably could have determined that Rocky Mountain and I.M.A. assented to an agreement that was complete as to its essential terms.

■ Furthermore, the fact that the August 1 letter stated that it was "preliminary in nature" does not foreclose a finding that Rocky Mountain and I.M.A. did in fact enter into a contract. "[T]he mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was executed the parol or informal contract should be without binding force." *Coulter v. Anderson,* 144 Colo. 402, 409–10, 357 P.2d 76, 80 (1960) (quoting Annot., 165 A.L.R. 756, 757 (1946)).

■ Before the court of appeals, Rocky Mountain argued that the discovery that I.M.A.'s liabilities totaled approximately $37,000 more than originally estimated justified Rocky Mountain "as a matter of law in refusing to proceed with finalizing any agreement" for the acquisition of I.M.A.'s stock. As previously discussed, however, there was evidence from which the jury could have concluded that a binding contract was entered before the parties learned of the discrepancy between the estimated and actual liabilities.

■ In the absence of any alternative claim by Rocky Mountain that the contract should be rescinded for mistake or misrepresentation, *see generally* Restatement (Second) of Contracts §§ 153, 164(1) (1981), the trial court properly dealt with the liability discrepancy as involving the sufficiency

against the moving party could not be sustained. *Union Supply Co. v. Pust,* 196 Colo. 162, 168, 583 P.2d 276, 279–80 (1978).

6. This rule should be distinguished from the one that applies when a court is construing an integrated, final document, established to be a contract. In the latter case, extrinsic evidence is not admissible to vary the meaning of an unambiguous document. *Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo.1981); *Miller v. L.C. Fulenwider, Inc.,* 146 Colo. 588, 594, 362 P.2d 570, 574 (1961).

of I.M.A.'s performance. In this regard, the jury was instructed without objection that it could not find for I.M.A. on I.M.A.'s breach of express contract claim unless it found that I.M.A. substantially performed those portions of the contract required to be performed by I.M.A. before Rocky Mountain was to act. The jury was also instructed that

> The words "substantial performance" or "substantial compliance" mean that, although the terms of the contract may have been departed from in small ways, such departures did not materially detract from the benefits Defendant Rocky Mountain Airways, Inc. would have derived from an exact performance, with the result that Defendant Rocky Mountain Airways, Inc. received substantially the benefit it contracted for.

The evidence showed that although the increased liabilities would have required a greater initial payment by Rocky Mountain had Rocky Mountain chosen to proceed with the acquisition, this possibility had been contemplated by the parties when they acknowledged in their August 1 letter that the specified amount of liabilities was an estimate. The parties made specific provision for updating the accounting records to determine the true amount. Moreover, there was evidence that the timing of the payment of the liabilities might be subject to negotiation with I.M.A.'s creditors. Thus, there was evidence from which the jury could have determined that notwithstanding the discrepancy in the amount of liabilities, Rocky Mountain would receive substantially the benefit for which it contracted. The instructions on substantial performance properly permitted the jury to determine whether the increase in the amount of I.M.A.'s liabilities was a significant enough departure from the terms of the agreement to excuse Rocky Mountain from performing.

██ Finally, the court of appeals incorrectly concluded that even if the August letters comprised a contract, Rocky Mountain's duty to perform would be discharged because some of the "conditions precedent," designated as "contingencies" in the August 1 letter, were not fulfilled. Actually, however, the evidence reflected that I.M.A. did obtain the approval of its shareholders and attempted to renegotiate the Animas Air Park lease. I.M.A. apparently was cooperating fully with Rocky Mountain's efforts to obtain regulatory approval up to the time when Rocky Mountain announced its decision not to purchase I.M.A.'s stock. Thus, the jury could have found that I.M.A. satisfied all the contingencies within its control, and then could have concluded, in accordance with the trial court's instructions,[7] that I.M.A. was excused for any nonperformance on its part since that nonperformance was caused by Rocky Mountain's conduct.

Because the evidence supports the jury's verdict for I.M.A. on breach of contract grounds, we do not address I.M.A.'s contention that the court of appeals should have considered I.M.A.'s unjust enrichment claim as a potential basis for upholding the jury's verdict.

### III.

Before the court of appeals, Rocky Mountain asserted several grounds for reversal of the trial court's judgment, but because the court of appeals reversed on the breach of contract issue, that court did not address any other grounds. Our resolution of the breach of contract issue, however, makes it necessary to consider Rocky Mountain's other assignments of error.[8] We find them without merit. We also ad-

---

7. The trial court instructed the jury by instruction no. 15:

> The failure of a party to fully perform a contract is excused if his performance is prevented or substantially hindered by the conduct of the other party. Therefore, I.M.A., Inc. is excused for any nonperformance on its part if you find that any nonperformance was caused directly or indirectly by the conduct of Rocky Mountain Airways, Inc.

8. Both parties assented to resolution of Rocky Mountain's other issues in this certiorari review and to the use for this purpose of the parties' briefs before the court of appeals.

dress and reject I.M.A.'s cross-appeal in which it contends that the trial court erred in disallowing prejudgment interest.

### A.

At several stages during the litigation, Rocky Mountain moved for dismissal under C.R.C.P. 19(a), claiming that because I.M.A.'s shareholders were not parties to the action, I.M.A. had failed to join indispensable parties. Rocky Mountain's motions were denied. Rocky Mountain contends that denial of the motions constitutes reversible error. We disagree.

■ C.R.C.P. 19(a) provides in pertinent part that:

A person who is properly subject to service of process in the action shall be joined as a party in the action if: (1) In his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may: (A) As a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Whether a party is indispensable within the meaning of C.R.C.P. 19 depends on the context of the particular litigation. *Jacobucci v. District Court*, 189 Colo. 380, 390, 541 P.2d 667, 674 (1975). In particular, whether it is necessary to join the stockholders of a corporation in an action involving the corporation "depends upon the nature of their interest in the controversy and the character of the claim for relief." 7 C. Wright & A. Miller, *Federal Practice and Procedure: Civil*, § 1615 (1972) (construing the substantially similar federal equivalent to C.R.C.P. 19).

In *Jacobucci v. District Court*, we held that the individual shareholders of a mutual ditch company are indispensable parties in an action to condemn the shareholders' decreed water rights. 189 Colo. at 384–85, 541 P.2d at 670. We noted, however, that

"the unique character of [mutual ditch] corporations mandates different treatment which is not fully in accord with the principles applicable to corporations in general." *Id.* at 388, 541 P.2d at 672. Shareholders in a mutual ditch corporation hold a specific property interest in a water right, an interest that is different from those of the corporation or of the other shareholders. *Id.* at 389, 391, 541 P.2d at 672–73, 675. Thus, in *Jacobucci*, we concluded that the shareholders' ability to protect their individualized interests would be impaired if the condemnation action proceeded without them.

■ I.M.A.'s shareholders, by contrast, do not have individualized interests in the present action. I.M.A. is fully capable of protecting the common interest of the corporation and the shareholders in seeing that Rocky Mountain compensate I.M.A. for breaching the agreement to purchase I.M.A.'s stock. As the trial court noted when it denied Rocky Mountain's post-trial motions:

It's clear the contract was made with the plaintiff corporation and the plaintiff corporation was acting on behalf of the shareholders in the case. The shareholders were only to get a limited amount of this money, so this corporation was acting on behalf of those long-term noteholders as well as the shareholders. My recollection of the testimony is that the shareholders had ratified the agreement and were bound by it, . . .

Thus, disposition of the present action in the shareholders' absence does not impair their ability to protect their interests.

Rocky Mountain's arguments that without I.M.A.'s shareholders as parties, complete relief cannot be accorded and a substantial risk of inconsistent obligations will exist, also fall short. Rocky Mountain asserts that the agreement; if there was one, called for a transfer of stock from I.M.A.'s shareholders to Rocky Mountain and a payment of money from Rocky Mountain to the shareholders, neither of which can be accomplished in the shareholders' absence. This argument ignores the fact that I.M.A. requested, and was awarded, damages, not

specific performance of the agreement. In the unusual circumstances present here, where I.M.A. agreed to a sale of stock held by its shareholders, and the shareholders confirmed and ratified that agreement, the payment of damages to the corporation for breach of that agreement has been implicitly authorized by the shareholders and they will be bound by the results of the litigation. Complete relief in the form of a damages award can be accorded without I.M.A.'s shareholders being joined as parties. The trial court properly denied Rocky Mountain's motion to dismiss under C.R.C.P. 19.

### B.

Rocky Mountain further contends that the jury's $300,000 verdict was grossly excessive and unsupported by the evidence. This contention lacks merit.

On the breach of contract claim, the jury was instructed very generally, and without objection, that in the event the jury found for I.M.A. on that claim, it must then find whether I.M.A. incurred damages as a result of the breach, and the amount of any such damages. The court instructed the jury that the amount of damages awarded should be "that amount which you find was a natural and probable consequence of the claimed breach of contract." *See* CJI-Civ.2d 30:35 (1980).

The $300,000 award is not manifestly excessive since there is evidence in the record to support that amount. Upon completion of the transaction, I.M.A.'s position would have been improved by Rocky Mountain's assumption of $137,000 in I.M.A. liabilities, and the I.M.A. shareholders would have received a maximum of $300,000, payable over time. Rocky Mountain, in turn, would have received all of I.M.A.'s stock. There was evidence from which the jury could have found that the stock was valueless in that I.M.A.'s liabilities exceeded the worth of its tangible assets, and the certificate of public convenience and necessity—the asset upon which the entire transaction was founded—had little or no value at the time of the breach.

The lack of value of the certificate of public convenience and necessity was supported by evidence that Aspen Airways had entered the market as a competitor on the Aspen-Durango route, Rocky Mountain had lost money during its period of operation on that route, and federal legislation that would obviate the need for a certificate of public convenience and necessity was imminent at the time Rocky Mountain refused to complete the transaction.

When the transaction failed, I.M.A. was left with $137,000 in liabilities and the shareholders were left with their arguably valueless stock instead of $300,000. Although Rocky Mountain now asserts that the $300,000 purchase price should have been discounted because it was payable over time, it presented no evidence and submitted no jury instruction in support of that theory.

There was evidence, therefore, that I.M.A. and its shareholders suffered damages as a result of the breach of contract in excess of the jury's award of $300,000. As the jury verdict is supported by evidence in the record, we must sustain it. *See Vigil v. Pine, Jr.,* 176 Colo. 384, 387, 490 P.2d 934, 936 (1971).

### C.

Rocky Mountain also protests the admission of several of I.M.A.'s exhibits, the exclusion of an exhibit offered by Rocky Mountain, and several of the trial court's rulings on objections to testimony. We have reviewed the various exhibits and the testimony and conclude that the trial court's evidentiary rulings were proper.

Rocky Mountain objected to the exhibits in question on the basis of lack of relevance, or the danger of unfair prejudice, confusion of the issues or misleading the jury. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Relevant evidence "may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." CRE 403. In evaluating an objection under CRE 403, we must assume the maximum probative value a reasonable factfinder might give the evidence and the minimum unfair prejudice to be reasonably expected. *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 199 (Colo.1984). We review the objections to the exhibits in light of those principles.

▮ Rocky Mountain asserts as error the admission of Rocky Mountain's applications to the Civil Aeronautics Board requesting an exemption from certain federal aviation requirements. Rocky Mountain acknowledges that I.M.A. offered the applications to show Rocky Mountain's projections of anticipated business on the Denver to Durango route, but claims that such a showing had no bearing on the issues at trial. To the contrary, the projections included in the applications were relevant to I.M.A.'s unjust enrichment claim since they indicated the route's value to Rocky Mountain. They also supported the contract damages claim by showing that sufficient traffic could be anticipated to generate the passenger fees upon which contract payments were to be made to I.M.A. shareholders. The same can be said about several admitted daily reports showing the number of passengers Rocky Mountain carried to and from Durango over a short period of time.

▮ The trial court also allowed into evidence a copy of a complaint against I.M.A. filed by one of I.M.A.'s creditors and the answer to the complaint. The answer was prepared for the signature of Rocky Mountain's vice president and general counsel as "Defendant's [I.M.A.'s] Attorney" and was dated September 18, 1978. This exhibit was relevant to I.M.A.'s claim that Rocky Mountain had begun to negotiate directly with I.M.A.'s creditors, in implementation of one part of the August 1 letter agreement.

▮ In addition, Rocky Mountain objects to the admission of a September 1978 draft entitled "Stock Purchase Agreement," stating that this exhibit offered nothing to prove the existence of an agreement between the parties concerning the purchase of I.M.A.'s stock. Although the exhibit did not conclusively prove the existence of such an agreement, its provisions are relevant to I.M.A.'s claim that the two parties had proceeded beyond negotiations, had entered into a binding contract, and were preparing for closing. Our review of this exhibit and those described in the preceding paragraphs discloses no significant potential for unfair prejudice, confusion of the issues or misleading the jury. *See* CRE 403.

Finally, Rocky Mountain asserts that the trial court committed reversible error when it excluded from evidence an exhibit setting forth the PUC regulations governing air carrier operations. Although the regulations may have been relevant to Rocky Mountain's claim that it leased I.M.A.'s PUC certificate in order to prevent its suspension, exclusion of the exhibit cannot be considered reversible error since Rocky Mountain was able to substantiate this uncontested point through another exhibit.

We have reviewed the numerous rulings on Rocky Mountain's objections to testimony and conclude that no reversible error occurred.

### D.

▮ Rocky Mountain's final contention urging reversal is that the jury instructions given by the court unfairly prejudiced Rocky Mountain's case. Rocky Mountain points to several instructions given, as well as several tendered by Rocky Mountain that the court refused to give. Rocky Mountain's objection in both regards is the very general one that the instructions given did not properly state the law and were not supported by competent evidence. The instructions to which Rocky Mountain objected all were taken from Colorado Jury Instructions Civil 2d (1980 & 1985 Supp.). Rocky Mountain fails to indicate in what way the given instructions varied from correct statements of law or to delineate any

specific ways in which the evidence falls short of supporting these instructions. Our review of the instructions in light of the evidence satisfies us that they were accurate and complete statements of the law as applied to this case and that the instructions tendered by Rocky Mountain and rejected by the court were either incorrect or the subject matter was covered adequately by the instructions given.

### E.

In its cross-appeal, I.M.A. asserted error by the trial court in denying prejudgment interest on the amount awarded by the jury from October 4, 1978, the date Rocky Mountain declined to proceed with the purchase, or in the alternative, from December 28, 1978, the date I.M.A. filed its amended complaint seeking damages instead of the specific performance remedy asserted in the original complaint. We sustain the ruling of the trial court.

 "The right to interest, independent of an agreement to pay it, is statutory." *Weaver v. First National Bank of Limon,* 138 Colo. 83, 96, 330 P.2d 142, 149 (1958). *Accord, e.g., York Plumbing & Heating Co. v. Groussman Investment Co.,* 166 Colo. 382, 384, 443 P.2d 986, 987 (1968).[9] I.M.A. relies upon the predecessor to section 5–12–102, 2 C.R.S. (1985 Supp.), in effect when judgment was entered in the present case, as the source of its right to prejudgment interest. That statute provided:

Creditors shall be allowed to receive interest, when there is no agreement as to the rate thereof, at the rate of eight percent per annum, for all moneys after they become due, on any bill, bond, promissory note, or other instrument of writing, or on any judgment recovered before any court or magistrate authorized to enter the same within this state, from the day of entering said judgment until

satisfaction thereof be made; also on money due on mutual settlement of accounts from the date of such settlement, on money due on account from the date when the same became due, and on money received to the use of another and retained without the owners' consent, expressed or implied, from the receipt thereof; and on money taken or retained and fraudulently converted to the taker's use from the time of taking.

Ch. 61, sec. 2, § 5–12–102, 1975 Colo.Sess. Laws 257.

 The present case does not fall under any of the provisions of the statute. I.M.A. sought damages for repudiation of the contract by Rocky Mountain or, in the alternative, for unjust enrichment. The amount of Rocky Mountain's obligation under either of these theories was unliquidated until the jury applied the court's instructions to the facts as it found them and arrived at its verdict. Section 5–12–102 makes no provision for the award of interest on these facts. *Cf. York Plumbing & Heating Co. v. Groussman Investment Co.* (prejudgment interest allowed on established amount unpaid on fully performed construction contract but disallowed on unliquidated setoff for breach of warranty; interest calculated on the difference between the liquidated and unliquidated claims).

### IV.

We conclude that the trial court properly allowed the jury to determine the existence of a contract between I.M.A. and Rocky Mountain. Furthermore, the evidence supports the jury's award of $300,000 to I.M.A. on the basis of I.M.A.'s breach of contract claim. Lastly, Rocky Mountain's supplemental claims on appeal and the cross-appeal of I.M.A. are without merit.

We reverse the judgment of the court of appeals and remand the case to that court

**9.** In some circumstances, however, we have recognized a nonstatutory right to interest by way of damages, or moratory interest. *Acme Delivery Service, Inc. v. Samsonite Corp.,* 663 P.2d 621, 625–26 (Colo.1983); *see Davis Cattle Co. v.*

*Great Western Sugar Co.,* 393 F.Supp. 1165 (D.Colo.1975); *Prospero Associates v. Redactron Corp.,* 682 P.2d 1193, 1200–01 (Colo.App.1983). No claim for moratory interest is asserted by I.M.A. in this case.

with directions to reinstate the judgment of the trial court.

ERICKSON, J., specially concurs.

DUBOFSKY, J., does not participate.

ERICKSON, Justice, specially concurring:

I concur with the majority opinion. However, I do not believe that the "Letter of Intent and Agreement" and later "Modification and Amendment" created a jury question on whether a contract existed between I.M.A. and Rocky Mountain Airways. In my view, the conduct of both parties subsequent to the exchange of the letters provided the evidence to create a jury issue and to support the jury's finding. I specially concur to express my view of Part II of the court's opinion.

The majority opinion demonstrates that the two letters from Rocky Mountain to I.M.A. had not yet advanced beyond the negotiation stage in forming the agreement. The first letter stated: "It is understood that this Letter of Intent and Agreement is preliminary in nature, and that each party will work toward more definitive statements and the execution of agreements and resolutions and contracts, that may be required to consummate the overall purposes of this intent and agreement letter." The letter also said that the contract was "contingent upon satisfaction" of five major "contingencies" (*see* majority opinion, at 885–886). In view of these explicit statements, it is clear that the two letters were part of the preliminary negotiation between the parties and do not, apart from the action and conduct of the parties, establish the existence of a contract. *See Ellis Canning Co. v. Bernstein*, 348 F.Supp. 1212 (D.Colo.1972); *D.A.C. Uranium Co. v. Benton*, 149 F.Supp. 667 (D.Colo.1956).

It is basic contract law that any evidence tending to explain or clarify the intent or purpose of the parties is admissible to show whether a writing has been assented to as the final expression of their agreement. *Miller v. L.C. Fulenwider, Inc.*, 146 Colo.

588, 594–95, 362 P.2d 570, 574 (1961). Here the parties' actions, taken together with the statements in the letters of intent, indicate that a final contract had been reached and that the parties believed all essential contract terms had been finalized. *See Federal Lumber Co. v. Wheeler*, 643 P.2d 31 (Colo.1981).

Rocky Mountain leased the PUC certification of public conveyance and necessity from I.M.A. for $500 per month. The PUC gave emergency temporary approval for the lease, and Rocky Mountain then began air service between Denver and Durango. I.M.A. also took action to renegotiate the landing lease at the Durango airport and to obtain shareholder approval of the agreement with Rocky Mountain. Finally, Rocky Mountain moved I.M.A.'s office furniture and equipment into the Rocky Mountain hangar in Denver.